EFFIE WATERS *et al.*, Plaintiffs-Appellees, *v*. THE CITY OF CHICAGO *et al.*, Defendants-Appellees.—(DOROTHY EPSTEIN *et al.*, Objectors-Appellants.)

First District (2nd Division)    No. 80-701

Opinion filed April 21, 1981.—Rehearing denied May 21, 1981.

Arvey, Hodes, Costello & Burman, Asher, Goodstein, Pavalon, Gittler, Greenfield & Segall, Ltd., Cooney & Stenn, and Tully, Roddy, Weinstein & Boyle, all of Chicago, for appellants.

Judge, Drew, Cipolla & Kurnik, Ltd., and Larry D. Drury, Ltd., both of Chicago, for appellees.

Mr. JUSTICE STAMOS delivered the opinion of the court:

This matter is now before the appellate court for the second time. In 1975, John Nebel filed a class action lawsuit against the city of Chicago, seeking relief from the defendant city's practice of postponing the payment of tort judgments. The trial court dismissed the complaint, and this court reversed. (*Nebel v. City of Chicago* (1977), 53 Ill. App. 3d 890, 369 N.E.2d 74.) On remand, Nebel's class action was consolidated with Effie Waters' similar class action. On October 30, 1979, the class of plaintiffs was certified.[1] On November 16, 1979, the parties filed with the court a proposed compromise and settlement of the action. Subsequently, a number of class members appeared and entered their objections to the proposed settlement. Dorothy Epstein objected and also sought leave to intervene as a party plaintiff. The trial court denied the objections, denied the petition to intervene, and approved the settlement. Epstein and three other objectors have appealed.

---

[1] The class includes "all unpaid tort judgment creditors of the defendant, THE CITY OF CHICAGO, as of the date of entry of this order [October 30, 1979]." On November 30, 1979, the class was modified to exclude those judgment creditors who had sold or assigned their judgments prior to November 16, 1979.

Before considering the merits of the settlement, we must first describe the city of Chicago's past practices. Prior to 1980, the city budgeted no more than $4.5 million per year to satisfy tort judgments rendered against the city. It was the practice of the city to pay judgments in the order in which they were entered, so, as the $4.5 million judgment fund became increasingly inadequate, delays in the satisfaction of tort judgments increased. Plaintiff Nebel's 1975 complaint alleged a 2½-year delay in paying judgments; by late 1979, when the lawsuit was settled, delays in satisfying judgments had increased to over 4 years. This period of delay did not affect judgment amounts of $1000 or less. The city paid these judgments in the order in which judgment creditors presented them for payment, and delay in satisfying these judgments was relatively minor, as most such awards were paid in the year entered.

Under the terms of the settlement, the city was required to budget $9 million for payment of tort judgments for each of the next 3 years (1980, 1981, and 1982). By January 1, 1983, the city was to budget an amount sufficient to pay all outstanding tort judgments. Under the agreement, the city would pay judgment creditors in the order in which the judgments were obtained. An exception was made for judgments of $1000 or less; the city could continue to pay these judgments promptly and prior to larger judgments. On December 10, 1979, the settlement agreement was modified to provide for judgment creditors excluded from the class (*i.e.*, those who had opted out of the class action). The city was required to give priority to class members, but when an excluded judgment creditor's judgment became 52 months old, that creditor was to receive priority. The settlement also provided for fees for the plaintiffs' attorneys and the trustee. These sums were to be assessed against the amounts due the members of the class; the final computation provided that each class member's judgment would be reduced by 1.30887%. A judgment creditor could escape this 1.3% assessment by opting out of the class, but he then lost priority of payment.

A class member holding a judgment for more than $1000 would, like all class members, accept a 1.3% reduction in his judgment. Plaintiffs argue that this reduction is more than offset by the benefit of remaining in the class: the judgment will be paid sooner because the city has doubled its budget for satisfaction of tort judgments.[2] If this class member elects to

---

[2] The objectors have pointed out that the city's 1980 budget was first prepared in tentative form in August 1979 and showed a $9 million amount for tort judgment satisfaction. This budget was prepared prior to the settlement and even prior to the settlement negotiations. Plaintiffs point out that this fact was not before the trial court. Further, plaintiffs argue, the settlement binds the city to budget a like amount in 1981 and 1982. Plaintiffs conclude that sufficient consideration has been shown, and, in any event, the point has been waived for appeal. We have not found it necessary to rely on these facts in ruling on the issues presented.

opt out of the class, the amount of his judgment will not be reduced. He will, however, be paid later than class members whose judgments are more recent. Fifty-two months after the entry of his judgment, he regains priority. By this time, his judgment is older than that of any unpaid class member, so the opting-out judgment creditor then has first priority for payment. The 52-month figure is apparently based on the waiting time as of November 1979, the time of the settlement, when judgment creditors were waiting about 4 1/3 years for satisfaction. Plaintiffs argue that a judgment creditor who opts out of the class is therefore in the same position he would be in had no action been brought: his judgment is satisfied approximately 52 months after entry.

Under the city's previous practice, persons holding judgments of $1000 or less were paid promptly. Under the settlement, these persons continue to receive the same priority. They are also subject to the 1.3% assessment for attorneys' fees. If, however, these small judgment creditors opt out of the class, they are not subject to the 52-month waiting period. Paragraph 7a of the settlement agreement (requiring that class members be paid before those excluded from the class) does not change the order of payment provided in paragraph 7, which is the section referring to judgments of $1000 or less.

The 1.3% assessment for attorneys' and trustee's fees was arrived at by dividing the total fee award ($220,000) by the aggregate amount of unpaid tort judgments held by members of the class ($16,808,309).[3] The $220,000 amount includes $20,000 for the trustee and $100,000 for the attorneys for each of the two plaintiffs. Plaintiff Nebel is represented by Byron D. Knight of the firm of Judge, Drew, Cipolla and Kurnik, Ltd. Plaintiff Waters is represented by Larry D. Drury. Attorney Knight's petition for fees contains a fully detailed listing of the time spent on the litigation, from December 1974 through December 1979. The 14-page listing shows 656 hours of work, and quotes an hourly rate of $75, for a total of $49,200. The petition also lists $126.66 in costs. Knight requests that the hourly total be multiplied by 3, and seeks a total fee award of $147,726.66. Attorney Drury's fee petition, lacking the specificity of Attorney Knight's, lists 526 hours of work performed between May 1, 1979, and December 10, 1979. The petition adds 125 hours for "Completion of litigation, anticipated time to close case and make refunds over a three year interval," for a total of 651 hours. Drury asks $100 per hour ($65,100), and asks that this figure be trebled ($195,300). A thorough review of the record does not reveal what factors were considered by the trial court in awarding each attorney $100,000.

On November 19, 1979, the trial court appointed a trustee to

---

[3] 286 judgments, having an aggregate value of $1,532,665, were excluded from the class.

administer the settlement. The trustee petitioned the trial court for fees on February 8, 1980. The petition contains the trustee's estimate that he will expend 400 hours over a 3-year period, and asks $40,000. As noted above, the trial court made an award of $20,000.

■■ The objectors first contend that the denial of Epstein's petition to intervene was error. Section 57.5 of the Civil Practice Act states that,

> "Any class member seeking to intervene or otherwise appear in the action may do so with leave of court and said leave shall be liberally granted except when the court finds that said intervention will disrupt the conduct of the action or otherwise prejudice the rights of the parties or the class." (Ill. Rev. Stat. 1979, ch. 110, par. 57.5(a).)

The Historical and Practice Notes to section 57.5 refer to section 26.1 of the Civil Practice Act, and state that the procedure for intervention and the status of intervenors is controlled by that section. (Ill. Ann. Stat., ch. 110, par. 57.5, Supplement to Historical and Practice Notes, at 116 (Smith-Hurd 1979 Supp.).) Section 26.1 provides for intervention as of right in certain cases; generally, however, intervention is allowed at the discretion of the trial court, and denial of intervention will not be reversed on appeal absent a clear abuse of that discretion. (See Ill. Rev. Stat. 1979, ch. 110, par. 26.1(2); *United Steelworkers of America v. Bailey* (1975), 29 Ill. App. 3d 392, 393, 329 N.E.2d 867.) Epstein's petition to intervene was presented on February 14, 1980. The objectors have not demonstrated that the trial court's denial of the eleventh hour petition was an abuse of discretion. The objectors' assignment of error, therefore, can only be upheld if Epstein's status was that of an intervenor as of right.

■■ Intervention is permitted as of right,

> "(a) when a statute confers an unconditional right to intervene; or (b) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant will or may be bound by an order or judgment in the action; or (c) when the applicant is so situated as to be adversely affected by a distribution or other disposition of property in the custody or subject to the control or disposition of the court or an officer thereof." (Ill. Rev. Stat. 1979, ch. 110, par. 26.1(1).)

In the case at bar, clause (a) does not apply, since section 57.5, the governing statute, does not create an unconditional right to intervene. Clause (b) does not apply, because, regardless of the adequacy of the class representation, Epstein could have avoided being bound by the result by opting out of the class. The objectors argue that clause (c) applies, since Epstein will allegedly suffer the adverse effects of addi-

tional delay if she opts out of the class, and will suffer a 1.3% fee assessment if she remains in the class. Since the 52-month waiting period was intended to leave opting-out creditors in their *status quo ante*, the nature of the claimed additional delay is unclear. Intervention as of right requires a more tangible detriment than the speculative additional delay that the objectors predict. The Committee Comments to section 26.1 state that, "Clauses (b) and (c) * * * provide for intervention as of right in the few instances in which the applicant would suffer tangible detriment if denied the right to intervene." (Ill. Ann. Stat., ch. 110, par. 26.1, Joint Committee Comments, at 318 (Smith-Hurd 1968).) We conclude that there was no error in the denial of the petition to intervene, and find it unnecessary to consider plaintiffs' charge that the petition was not timely made.

■■■ The next issue is whether the settlement itself should be sustained. Our supreme court has supplied the standard to be used in evaluating the compromise settlement of a class action: the agreement must be fair, reasonable, and in the best interest of all affected. Evaluation of the settlement is a discretionary matter, and a reviewing court will not upset the trial court's judgment without a showing of abuse of discretion. (*People ex rel. Wilcox v. Equity Funding Life Insurance Co.* (1975), 61 Ill. 2d 303, 316, 335 N.E.2d 448 (hereinafter *Equity Funding*).) The same standard is used in the Federal courts. See *Patterson v. Stovall* (7th Cir. 1976), 528 F.2d 108, 112.

Our supreme court in *Equity Funding* stated that a settlement must be "in the best interest of all those who will be affected by it." (*Equity Funding*, at 316.) We believe that absent class members are necessarily included in "all those." In a class action, the court is the guardian of the interests of the absent class members. (*Zerkle v. Cleveland-Cliffs Iron Co.* (S.D.N.Y. 1971), 52 F.R.D. 151, 159; see *Fiorito v. Jones* (1978), 72 Ill. 2d 73, 88, 377 N.E.2d 1019.) A settlement which is unfair to a subclass or a fraction of the class should not be sustained. (See *In re General Motors Corp. Engine Interchange Litigation* (7th Cir. 1979), 594 F.2d 1106, 1133, *cert. denied* (1979), 444 U.S. 870, 62 L. Ed. 2d 95, 100 S. Ct. 146.) In the case at bar, the subclass of persons holding judgments of $1000 or less received virtually no benefit from the settlement. Prior to the settlement, these creditors were paid more or less promptly. Under the terms of the settlement, the city is to follow the same payment procedure with respect to this subclass. Although the city has agreed to budget a larger amount for the payment of tort judgments, this promise only benefits the holders of larger amounts who were faced with a waiting period in excess of four years. The only effect of the settlement that the members of the subclass will see is a 1.3% reduction in the amount of their judgments. They could have escaped this assessment by opting out of the class, but few chose to

do so.[4] It is understandable that few members of the subclass would perceive the benefit of opting out: the published notice of the settlement did not include paragraph 7a, which contains the provisions for paying judgment creditors excluded from the class. The notice of the proposed settlement was prepared on November 30, 1979; paragraph 7a was inserted in the proposed settlement on December 10, 1979.[5] While an amended notice to the class would have entailed additional cost and delay, expedience does not justify disregarding the rights of even a fraction of the class. (See *In re General Motors*, at 1133.) The reviewing court cannot rewrite the parties' settlement to excise unfair portions; it can only approve or disapprove of the entire agreement. (*In re General Motors*, at 1133.) Given the lack of consideration for the rights of the under-$1000 subclass, we find that the trial court's approval of the settlement was an abuse of discretion.

■■ Plaintiffs contend that the objectors have no standing to assert the rights of the subclass, since all objectors hold judgments greater than $1000. This argument misses the point. The burden is on the proponents of a class action settlement to prove that the compromise is fair and reasonable. (*Zerkle*, at 159.) If the objectors can point to an unfair or inadequate aspect of the settlement, then the proponents have failed to carry their burden, irrespective of whether that aspect impinges on the rights of the objectors personally. The very existence of an unfair portion of the settlement also indicates that the trial court has failed to adequately consider the rights of absent class members.

■■ Plaintiffs' argument that the objectors have waived this point by not raising it in the trial court must fail for the same reason. The general rule is that new theories and new claims not considered by the trial court cannot be raised for the first time on appeal. (See *Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147, 324 N.E.2d 417.) Here, however, the trial court was obligated to consider the rights of absent class members (see *Zerkle*, at 159), and evidence that it did not is a proper matter for appellate review.

---

[4] *Six of the 286 excluded creditors held judgments of $1000 or less.*

[5] This defect of notice also raises questions concerning the fairness of the settlement to absent class members holding judgments greater than $1000. While the notice adequately informed class members of their right to opt out, and provided clear instructions on the method of opting out, the notice did not reveal the consequences of opting out, and thus necessarily failed to give class members a basis for evaluating their two options. Even though the settlement gave most class members a *quid pro quo* (accelerated satisfaction in return for a 1.3% reduction), fairness might dictate that a class member's decision to remain in the class be a fully informed one. In particular, creditors whose judgments were already 52 months old in February 1980 had no way of knowing that remaining in the class would be of no benefit. When one of the objectors' attorneys pointed out this fact to the trial court, he was rebuffed.

■■ The next issue is whether the trial court's award of attorneys' and trustee's fees was proper. An award of attorneys' fees in a class action is contingent upon success, and upon the existence of a fund from which the fees can be paid. (See *Fiorito*, at 87.) Plaintiffs argue that the promised increased appropriations by the city constitute a fund for the payment of fees. Since we hold that the order approving the settlement must be vacated, both the "success" and the "fund" have perished. Similarly, the trustee's fee is based on his future actions to implement the settlement, so vacation of the lower court's order also necessitates a vacation of the trustee's fee award.

■■ Since the question of attorneys' fees will again be presented to the trial court, however, we are obliged to note that the lower court erred in its order for payment of attorneys' fees. As described above, attorneys Knight and Drury presented the trial court with petitions requesting that their hourly rate charges ($49,326.66 and $65,100, respectively) be multiplied by 3. The multiplication factor for class action attorney fees was discussed by our supreme court in *Fiorito v. Jones* (1978), 72 Ill. 2d 73, 89-93, 377 N.E.2d 1019. The trial court first considers the number of hours expended by the attorneys. After disallowing time spent that did not benefit the class, the trial court determines whether the hourly total is reasonable, and notes whether the time has been expended by law clerks, associates, or senior partners. The trial court then considers the complexity of the problem and the skill of the attorneys, and fixes an hourly rate of compensation. The hourly rate, multiplied by the allowable hours, is called the "lodestar computation," because it provides the point of orientation for determining the final fee award. (See *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.* (3d Cir. 1973), 487 F.2d 161, 168.) The lodestar computation can then, at the discretion of the trial court, be adjusted by a multiplier. The application of a multiplier depends on two factors: the contingent nature of the class' recovery (an unlikely recovery justifying an increased fee), and the quality of the benefit to the class. The supreme court in *Fiorito* specified that, if the trial court is to award fees greater than the lodestar computation, it should identify the factors that merit the increase, and state the value of the multiplier applied. 72 Ill. 2d 73, 92; see also *Lurie v. Canadian Javelin Ltd.* (1980), 92 Ill. App. 3d 15, 19-21, 415 N.E.2d 1055.

In the instant case, a multiplier was evidently applied, as each attorney received $100,000, and the quoted hourly rates totaled $49,200 and $65,100, respectively. The trial court made no findings that warrant the application of a multiplier. We read *Fiorito* to require that such findings must be specific and in the record.

Furthermore, the hourly rate totals ($49,200 and $65,100) do not appear to have been submitted to the scrutiny demanded in *Fiorito*. Although attorney Knight's petition is admirably detailed, there is no evidence that

the trial court made an independent determination of the reasonableness of the hourly rate requested. Attorney Drury's petition contained a very general accounting of time spent, and the trial court might well have inquired into the hourly total, since Drury managed to expend in 7 months nearly as much time as Knight's firm spent over a 5-year span, during which period Knight's firm successfully prosecuted the earlier appeal of this case. The 125 hours charged by Drury for completing the litigation and making refunds is particularly suspect, in light of the fact that it was the trustee's duty to implement the terms of the settlement.

In consideration of the foregoing, the trial court's order denying the petition to intervene is affirmed; the order approving the settlement and the orders approving attorneys' and trustee's fees are vacated, and the cause is remanded for further proceedings in the trial court.

Vacated and remanded.

DOWNING and PERLIN, JJ., concur.