Sylvia EVANS, et al.,
Plaintiffs–Appellees,

v.

CITY OF CHICAGO, et al.,
Defendants–Appellants.

Bertha BALARK, et al.,
Plaintiffs–Appellees,

v.

CITY OF CHICAGO, et al.,
Defendants–Appellants.

Curtis COLLUM, et al.,
Plaintiffs–Appellees,
Cross–Appellants,

v.

CITY OF CHICAGO, et al.,
Defendants–Appellants,
Cross–Appellees.

Nos. 87–3006, 87–3085.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 8, 1988.

Decided April 27, 1989.

As Modified April 28, 1989.

Dodge Wells, Asst. Corp. Counsel, Chicago, Ill., for defendants appellants.

John Bernard Cashion, Edward T. Stein, Singer & Stein, Chicago, Ill., for plaintiffs appellees.

Before BAUER, Chief Judge, and WOOD, Jr. and RIPPLE, Circuit Judges.*

HARLINGTON WOOD, Jr., Circuit Judge.

This is a consolidated class action suit that has been in the courts for nearly a decade. The three plaintiff classes sued the City of Chicago under 42 U.S.C. § 1983 claiming that the City's delay in paying tort judgment claimants violated their civil rights. This court originally dealt with this case over six years ago. *Evans v. City of Chicago*, 689 F.2d 1286 (7th Cir.1982) (*"Evans I"*). There we affirmed the district court's finding that Chicago's practice was unconstitutional. The case was remanded to the district court to sort out the question of damages due to the parties. In district court, plaintiffs advanced another equal protection claim in addition to the claim originally passed on by this court. The district court found for the plaintiffs on both equal protection allegations and

---

* This opinion has been circulated among all judges of this court in regular active service. No judge favored a rehearing *en banc* on the question of overruling *Evans v. City of Chicago,* 689 F.2d 1286 (7th Cir.1982). Circuit Rule 40(f).

awarded damages. The City has appealed, asking us not only to review the district court's findings but to also re-examine our own decision in *Evans I.*

## I. FACTUAL BACKGROUND

Millions of dollars in court judgments are entered against the City of Chicago ("the City") each year. The City's practice of delaying payment of some judgments is under attack by three different plaintiff classes.

### A. The Plaintiff Classes

Plaintiff Sylvia Evans settled her lawsuit against the City for the wrongful death of Andrew Evans and a judgment of $67,000 was entered against the City on January 30, 1976. After entry of her judgment, Evans learned that the City had a policy of promptly paying (within thirty days) tort judgments under $1,000 while it delayed paying any tort judgments over $1,000 for a substantial time period. When Evans learned that the City would delay the payment of her judgment, she filed an action against the City under 42 U.S.C. § 1983 claiming that her civil rights had been violated by the delay. The action was certified as a class action under Fed.R.Civ.P. 23(b)(3). The *Evans* class includes tort judgment creditors holding judgments larger than $1,000 against the City whose judgment payments are more than one year overdue.[1]

Plaintiff Bertha Balark brought a civil rights action under 42 U.S.C. § 1983 against six Chicago police officers in 1977. The case was settled by the parties and a judgment was entered by the United States District Court. The judgment was to be paid by the City.[2] Upon learning that the City would delay paying her judgment, Balark brought a separate class action under 42 U.S.C. § 1983. The *Balark* class was certified and includes tort judgment creditors holding judgments larger than $1,000 against the City whose judgment payments are less than one year overdue.[3] The *Evans* and *Balark* actions were consolidated on January 28, 1981.[4]

1. The *Evans* class was defined as:

   [a]ll persons in whose favor a final tort judgment in excess of $1,000 against the City of Chicago has been or will have been entered commencing with the fiscal year 1972 and continuing to the date of the entry of final judgment in this case and payment of whose judgment is overdue by reason of the failure of the City of Chicago (a) to pay the judgment in full in the fiscal year it was entered or in full during the ensuing fiscal year in accordance with Ill.Rev.Stat. ch. 85, § 9–104(a) or (b) to commence timely payment of installments on the judgment pursuant to Ill.Rev.Stat. ch. 85, § 9–104(b) no later than the end of the first fiscal year following the entry of judgment. The class shall not include assignees or purchasers of judgments nor those persons who assigned, factored or "discounted" their judgments prior to full or partial payment by the City of Chicago. *Evans I,* 689 F.2d at 1290–91 n. 6.

2. Ill.Rev.Stat. ch. 85, ¶ 9–102.

3. The class was certified and defined as:

   [a]ll persons in whose favor a final tort judgment in excess of $1,000.00 against the City of Chicago has been or will have been entered commencing with fiscal year 1974 who have held their judgments without full satisfaction thereof for a period not greater than the end of the fiscal year following the year in which the judgment was obtained. *Evans I,* 689 F.2d at 1291 n. 7.

4. During the time these federal lawsuits were proceeding, similar actions had been filed in Illinois state court. In *Nebel v. City of Chicago,* 53 Ill.App.3d 890, 11 Ill.Dec. 620, 369 N.E.2d 74 (1977), the City's practice of delaying payment of tort judgments was challenged. The parties settled the case in 1980, with the City agreeing to provide $9 million in each of the 1980, 1981, and 1982 annual budgets to pay tort judgment creditors. The City also agreed to appropriate adequate funds in the future to pay all tort judgments and attorneys' fees. This settlement was vacated and remanded by the Illinois Appellate Court. *Waters v. City of Chicago,* 95 Ill.App. 3d 919, 51 Ill.Dec. 185, 420 N.E.2d 599 (1981). The appellate court found that the settlement's provisions concerning trustee and attorneys' fees did not provide notice to the holders of judgments less than $1,000. *Id.* at 925, 51 Ill. Dec. at 190, 420 N.E.2d at 604. The settlement was later revised by the trial court, but it was again vacated by the appellate court, *Waters v. City of Chicago,* 111 Ill.App.3d 51, 66 Ill.Dec. 833, 443 N.E.2d 759 (1982), which was still troubled by the manner of awarding attorneys' fees. An issue of abstention was raised in the *Evans I* trial, but this court held that it was inappropriate for the federal court to abstain in this situation. *Evans v. City of Chicago,* 689 F.2d 1286, 1294–96 (7th Cir.1982).

Plaintiff Curtis Collum entered into a settlement with the City and four police officers who allegedly beat him. Collum claims that at the time his judgment was entered, it was the practice and custom of the City to delay payment of judgments from two to four years. As a result of these delays, a market developed for the sale of judgments against the City. Unwilling to wait to collect his judgment from the City, Collum sold his judgment at a discount. Collum filed this class action suit in 1979 under 42 U.S.C. § 1983 alleging that the delay violated equal protection and due process. While the *Evans* and *Balark* classes are made up of creditors who waited for the City to pay their judgments, the *Collum* class is made up of plaintiffs who assigned their judgments at a discount. The class was certified under Fed.R.Civ.P. 23(b)(3). The *Collum* class includes tort judgment creditors holding judgments larger than $1,000 against the City who assigned their judgments at a discount knowing the City would delay payment.[5] Plaintiffs in the *Evans* and *Balark* classes are original judgment holders while the *Collum* plaintiffs are assignors, since they assigned their judgments at a discount. Eighty percent of judgment holders with judgments over $1,000 sold their judgments. Purchasers bought judgments at a discount and the amount of the discount reflected a prediction of the delay in payment. All three classes were consolidated at trial and on appeal.[6]

## B. The City's Practice

Under the budgetary scheme adopted by the City, judgments levied against the City are paid out of different city funds depending on the origin of the claim. At trial, the City maintained that all tort and nontort judgments arising from certain special enterprise activities ("enterprise judgments") are paid from revenues generated by the enterprises themselves. Such enterprises include the Water Fund, the Sewer Fund, O'Hare Airport, Midway Airport, and the Chicago Skyway. These enterprises are meant to be self-sustaining with user fees generating revenue and are separated for accounting purposes from the City's general revenue funds. Judgments arising from relationships undertaken by the City ("contract judgments") are paid from departmental funds. When a city department enters a contract, the department's budget is encumbered for the maximum amount that could be due under the contract. If a judgment is levied against the City for breach of that contract, the judgment is paid out of the encumbrance already on the books. The departmental appropriations that pay such contract judgments are financed by general municipal taxes appropriated to the City's general corporate fund. Judgments arising out of employment-related litigation are usually payable from the personnel budgets of the affected departments.

All remaining judgments against the City ("tort judgments") are paid from the City's Tort Judgment Fund, also known as the "395 Fund." Revenue for the 395 Fund is raised through a separate property tax levy. This fund is not part of the City's general corporate fund.

■ Between 1972 and 1983, the period we are most concerned with, the City normally paid enterprise judgments and contract judgments within thirty to one hundred-fifty days of presentment. However, this was not the case for judgments paid out of the 395 Fund. The 395 Fund was annually underfunded, resulting in the City's inability to pay off all tort judgments in a timely fashion. Tort judgments of $1,000 or less were given priority and paid off within approximately thirty days of presentment. Judgments over $1,000 were paid off in the order they were entered, but at a much delayed rate. The average delay

**5.** The *Collum* class was defined as:

[a]ll persons in whose favor a final tort judgment or settlement in excess of $1,000.00 against the City of Chicago has been entered and who, commencing with fiscal year 1974 assigned their tort judgments, at a discount, prior to full or partial payment, in reliance upon defendant's policy and practice of delaying payments of judgments. *Evans v. City of Chicago*, 522 F.Supp. 789, 807–08 (N.D.Ill. 1980).

**6.** The *Collum* class was not a party to the appeal in *Evans I*.

in payment of tort judgments over $1,000 ranged from fifteen months to four years after the entry of final judgment. Payment of some judgments apparently was delayed as long as nine years. The City pays interest at the statutory 6% rate at the time it pays the judgment. Ill.Rev. Stat. ch. 110, ¶ 2–1303.[7] The delay in paying tort judgments stemmed from the City's practice of levying a special property tax each year to pay judgments at an amount that was far less than needed to pay the annual tally of judgments. The City refused to apply any other revenue to the payment of tort judgments.

## C. *Evans I*

Plaintiffs individually and collectively launched a number of attacks on the City's system of paying tort judgments. In the first trial, the City's distinction between judgment creditors above or below $1,000 was alleged to be a violation of the equal protection clause of the fourteenth amendment. Plaintiffs also alleged that the practice of delaying payment of judgments for up to four years deprived them of due process.[8]

The district court, having certified the plaintiff classes, consolidated the *Evans* and *Balark* cases. On plaintiff's motion for partial summary judgment and immediate payment, the district court ordered the City to pay immediately all judgments held by *Evans* class members plus costs and interest, enjoined the City's practice of paying judgments of $1,000 or less before earlier-entered, larger judgments, and de-

---

**7.** Although the parties did not raise the issue, we have some concerns about the City's handling of tort judgments entered by a federal district court. The City's policy of paying the 6% interest rate mandated by Illinois law is correct for all judgments entered prior to October 1, 1982. On that date, 28 U.S.C. § 1961 was amended. The old language establishing interest on judgments entered in a federal court at the rate set by state law was replaced by language providing that judgment debtors pay interest at the "coupon issue yield equivalent" of U.S. Treasury bills. 28 U.S.C. § 1961(a). This new rate of interest does not apply to judgments entered before the effective date of the statute. *Merit Ins. Co. v. Leatherby Ins. Co.,* 728 F.2d 943, 944 (7th Cir.) (amended section 1961 does not apply to judgments entered before October 1, 1982), *cert. denied,* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984). *See Litton Systems v. AT & T,* 746 F.2d 168, 175 (2d Cir.) (new rate not retroactive and it does not apply to cases pending at that date on direct review), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984); *United States v. Dollar Rent A Car Systems, Inc.,* 712 F.2d 938, 940 n. 5 (4th Cir.1983).

On judgments entered in federal district court after October 1, 1982, the City must pay the interest rate prescribed by 28 U.S.C. § 1961(a) and provide all relief ordered by the court. It is unclear from the record whether the City has followed this rule. The correct rate of interest is an essential part of the relief granted by a district court. When a judgment is entered by a federal district court, the City must pay the proper amount of interest, regardless of the limit set by state statute. *See Travelers Ins. Co. v. Transport Ins. Co.,* 846 F.2d 1048, 1053–54 (7th Cir.1988).

**8.** Plaintiffs also challenged the constitutionality of Ill.Rev.Stat. ch. 85, § 9–104, which stated:

(a) If a local public entity does not pay a tort judgment or settlement during the fiscal year in which it becomes final and if, in the opinion of its governing body, the unpaid amount of the tort judgment is not too great to be paid out of revenues for the ensuing fiscal year, the governing body shall pay the balance of the judgment during the ensuing fiscal year.

(b) If the local public entity does not pay the tort judgment or settlement during the fiscal year when it becomes final and its governing body is of the opinion that the unpaid amount of the judgment or settlement is so great that undue hardship will arise if the entire amount is paid out of the revenues for the ensuing fiscal year, the governing body shall pay the judgment or settlement, with interest thereon, in not more than 10 annual installments. Each payment shall be of an equal portion of the principal of the tort judgment or settlement. The governing body, in its discretion, may prepay any one or more installments or any part of an installment.

Ill.Rev.Stat. ch. 85, ¶ 9–104, subsequently *amended by* P.A. 84–1431, Art. 1, § 2, 1986.

The district court did not hold § 9–104(a) facially unconstitutional and the *Evans I* court therefore did not rule on that issue. *Evans I,* 689 F.2d at 1291–92. The district court did find ¶ 9–104(b) unconstitutional and set forth the minimum procedures it found necessary to guarantee due process. This court in *Evans I* vacated that portion of the decision, finding that the district court improperly reached the issue. *Evans I,* 689 F.2d at 1299. The constitutionality of ¶ 9–104 is not at issue on this appeal. This court will follow the lead of the *Evans I* court and refrain from expressing any opinion on the constitutionality of the statute.

clared the practice unconstitutional. The court also declared that Ill.Rev.Stat. ch. 24, ¶ 8-1-16 was unconstitutional, to the extent that it authorized the practice.[9] The district court found that the City's policy violated equal protection and deprived the plaintiffs of property without due process.[10]

On appeal, this court affirmed the district court's finding that the City's practice of paying judgments out of order was unconstitutional. The court in *Evans I*, applying the rational basis test articulated in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), found that the practice was a violation of equal protection.[11] The holding in *Evans I* applied only to the issue of paying tort judgments assessed to the 395 Fund out of order. The district court's decision was affirmed[12] and the case was sent back to iron out the question of damages and other issues.

### D. The Consent Decree

After this case was remanded to the district court, the City negotiated a consent decree with the *Evans* and *Balark* plaintiffs. The consent decree, entered on May 31, 1984, governs the payment of tort judgments that remained unpaid as of December 31, 1983 and the payment of future judgments beginning in 1984. The decree was designed to bring payment of judgments up to a current basis by the end of 1985. The decree required that the City appropriate sufficient funds annually to satisfy the City's anticipated tort liabilities. The decree also required the City to pay its judgments in the order in which they are entered. The decree expressly left open all claims to damages; by its terms it could not be used as evidence in the trial. No judgments entered after December 31, 1984 were at issue in the *Evans II* trial.

### E. *Evans II*

This case returned to the district court in 1987, ostensibly for computation of damages. However, the plaintiffs were not content with the liability established by this court in *Evans I* and presented a new theory of liability to the district court. The plaintiffs noted that enterprise and contract judgments were paid in order while tort judgments were delayed. Plaintiffs now argued that delaying the payment of tort judgments out of the 395 Fund while

---

**9.** This statute allowed the City to levy a limited judgment tax in addition to the maximum amounts authorized for all other taxes and it exempted judgments of $1,000 or less from the requirement that judgments be paid in the order in which they were obtained. *Evans I*, 689 F.2d at 1299 n. 16. On appeal, the *Evans I* court found that although the City's practice did not originate with Ill.Rev.Stat. ch. 24, ¶ 8-1-16, it was still unconstitutional insofar as it incorporated the practice. *Evans I*, 689 F.2d at 1300.

**10.** The district court also declared the judgment final and appealable under Fed.R.Civ.P. 54(b) and reserved the issue of attorneys' fees. *Evans I*, 689 F.2d at 1291.

**11.** The *Evans I* court also discussed whether the City's practice deprived the plaintiffs of property without due process. *Evans I*, 689 F.2d at 1296–99. The court concluded that Illinois law created a right to prompt payment of a judgment in some circumstances. The *Evans I* court found that:

> [u]nder Illinois law, if the City has not invoked § 9-104(b) before the end of the fiscal year following the year in which the tort judgment became final, the tort judgment holder may legitimately claim entitlement to

immediate payment. Thus, at least in that situation, the right to immediate payment of a tort judgment against a municipal corporation becomes a property right under Illinois law. *Evans I*, 689 F.2d at 1297.

Delaying payment after that time constituted a deprivation of property for purposes of the fourteenth amendment. *Id.*

The importance of this due process finding is unclear. While the *Evans I* court found a deprivation, *see also Minton v. St. Bernard Parish School Bd.*, 803 F.2d 129, 132 (5th Cir.1986) (distinguishing *Evans I* since Illinois law creates specific property right); *Argento v. Village of Melrose Park*, 838 F.2d 1483, 1491 (7th Cir.1988) (*Evans I* stands for proposition that Chicago's practice was "deprivation of property without due process of law"), the focus of *Evans I* and all subsequent litigation has been the alleged equal protection violations. The *Evans II* district court found no due process violations and the due process issue was not argued by the parties on this appeal.

**12.** The *Evans I* court vacated the section of the district court's opinion that found Ill.Rev.Stat. ch. 85, ¶ 9-104(b) unconstitutional. *Evans I*, 689 F.2d at 1300.

promptly paying nontort judgments with other funds violated equal protection.

The district court agreed and found that this system constituted a separate equal protection violation. The district court held that the City violated equal protection by not paying all judgments in order, regardless of the source of funding or the amount of the judgment. The court found that the holders of tort judgments for amounts greater than $1,000 were denied equal protection because they suffered greater delays in the payment of their judgments than did judgment creditors who held enterprise judgments, contract judgments, judgments payable from department personnel budgets, or judgment creditors who held tort judgments of less than $1,000 and received priority payment from the 395 Fund. The City's chronic underbudgeting of the 395 Fund was in itself an equal protection violation and the district court stated that the City must raise taxes to pay off judgment creditors. The district court could find no rational basis for paying judgments out of separate funds or for underfunding the 395 Fund. The district court dealt with whether paying tort judgments under $1,000 before judgments over $1,000 violated equal protection by stating that this court's holding in *Evans I* was the law of the case.

The district court created a complicated system for computing damages resulting from the equal protection violations. *Evans* and *Balark* plaintiffs would receive interest on their judgments at a rate greater than the statutory post-judgment rate of 6%. The interest would be computed beginning on the sixty-first day after entry of the judgment through the date the judgment was actually paid. The interest rate is to be calculated pursuant to a formula stipulated by the parties that will yield a rate of interest equal to "the difference between the statutory rate of interest and the money that plaintiffs could have earned with the funds had they had them when they should have had them." *Collum* plaintiffs were divided into two groups based upon the length of the City's delay in paying tort judgments at the time a given judgment was sold at a discount. *Collum*

plaintiffs who sold their judgments during a time when the City was delaying payment by a year or more were awarded damages equal to the amount of their discount, prorated over the period beginning sixty-one days after the entry of judgment through the date of payment to the assignee, plus interest at the stipulated rate. *Collum* plaintiffs who assigned their judgments at a time when the City was delaying payments by less than a year were awarded damages on the same basis as the *Evans* and *Balark* plaintiffs.

Final judgment was entered on November 23, 1987 and the City filed a timely notice of appeal. The City asks this court to re-examine its decision in *Evans I* and argues that this case falls within a recognized exception to the law of the case doctrine. The City also asks us to reverse the *Evans II* district court's new findings on equal protection. The *Collum* plaintiffs also filed a cross appeal, claiming that the district court incorrectly calculated the damages due their class members.

## II. DISCUSSION

This case presents us with the unfortunate and difficult task of re-examining an earlier decision of this court. We must first examine the law of the case doctrine and determine its applicability to the present situation. This court's decision in *Evans I* must be analyzed to determine how that opinion should affect this appeal. This court must also review the district court findings of additional equal protection violations.

### A. The Law of the Case

■ The first issue is what effect we should give to this court's decision in *Evans I*. While that prior appeal did not dispose of all the issues presented on this appeal, the *Evans I* court did hold that the City's practice of delaying payment of tort judgments over $1,000 violated equal protection. This court has long held that "matters decided on appeal become the law of the case to be followed in all subsequent proceedings in the trial court and, on sec-

ond appeal, in the appellate court, unless there is plain error of law in the original decision." *Kaku Nagano v. Brownell,* 212 F.2d 262, 263 (7th Cir.1954). The law of the case doctrine "is a rule of practice, based on sound policy that, when an issue is once litigated and decided, that should be the end of the matter." *Barrett v. Baylor,* 457 F.2d 119, 123 (7th Cir.1972) (citing *United States v. United States Smelting, Refining & Mining Co.,* 339 U.S. 186, 198, 70 S.Ct. 537, 544, 94 L.Ed. 750 (1950)).

It is important to note that the law of the case doctrine does not limit this court's power to reconsider earlier rulings in a case. The doctrine

> is a self-imposed prudential limitation rather than a recognition of a limitation of the courts' power. 1B Moore's Federal Practice ¶ 0.404[10] at 573 (2d ed.1980). It is not, therefore, an immutable rule, but rather a way to foreclose continued appeals for reconsideration of prior rulings of law. In this respect, the law of the case doctrine must be distinguished from *res judicata:* '[O]ne directs discretion; the other supersedes it and compels judgment.'

*Gertz v. Welch,* 680 F.2d 527, 532 (7th Cir.1982), (quoting *Southern Ry. Co. v. Clift,* 260 U.S. 316, 319, 43 S.Ct. 126, 127, 67 L.Ed. 283 (1922)), *cert. denied,* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983).

This court has, on a limited number of occasions in subsequent appeals, reconsidered a previous decision in the same case and concluded that the former ruling was clearly erroneous. *See, e.g. Devines v. Maier,* 728 F.2d 876, 880 (7th Cir.) (intervening Supreme Court decision led to reversal of earlier decision), *cert. denied,* 469 U.S. 836, 105 S.Ct. 130, 83 L.Ed.2d 71 (1984); *Appleton Elec. Co. v. Graves Truck Line, Inc.,* 635 F.2d 603, 608 (7th Cir.1980) (earlier pronouncement on jurisdiction was in error), *cert. denied,* 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981); *United States v. Habig,* 474 F.2d 57 (7th Cir.) (earlier decision was erroneous), *cert.*

*denied,* 411 U.S. 972, 93 S.Ct. 2145, 36 L.Ed.2d 695 (1973). Such a reconsideration should be avoided unless "one of three 'exceptional circumstances' exists: the evidence in a subsequent trial was substantially different; controlling authority has since made a contrary decision of law applicable to such issues; or the decision was clearly erroneous, and would work a substantial injustice." *Barrington Press, Inc. v. Morey,* 816 F.2d 341, 342–43 n. 2 (7th Cir.1987) (quoting *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.,* 761 F.2d 649, 657 (Fed.Cir.1985)), *cert. denied,* 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985). *See also Devines,* 728 F.2d at 880. Applying these guidelines to this case, we note that there was indeed some new evidence at the second trial explaining why the City chose to prioritize judgments under $1,000. The record at the first trial was sparse on the subject of the City's reasoning for its practice. Plaintiffs chose to reopen the merits of this case in the second trial to establish a separate equal protection violation. This allowed the City to bring in more evidence explaining its conduct. While this new evidence alone may not compel reconsideration of our prior adjudication, this court is left with substantial doubt as to the correctness of that decision. By going beyond the remand for computation of damages and reopening and extending the equal protection analysis to a related situation, the underlying equal protection analysis was again exposed for reconsideration and review. "The law of the case does not demand obsequiousness right or wrong." *Champaign–Urbana News, Inc. v. J.L. Cummins,* 632 F.2d 680, 683 (7th Cir.1980). We will therefore reconsider our prior determination in this matter to determine whether it may have been wrongly decided.

**B. *Evans I* Equal Protection Analysis**

◼ The City's actions are being challenged under 42 U.S.C. § 1983 [13] and its alleged equal protection violations fall into two categories. In the *Evans II* trial, the district court found that the City was obli-

---

**13.** A city can be held liable under 42 U.S.C. § 1983 for unconstitutionally implementing a policy or custom. *Monell v. New York City*

*Dept. of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

gated by the equal protection clause to establish a single order of payment for all judgments of any kind entered against the City. In addition, the City was obligated to raise sufficient revenues through taxation to allow it to pay all tort judgments from the 395 Fund as promptly as it paid other judgments. This holding by the district court is distinct from the prior decision made by this court in *Evans I*. There, we held that the City's practice of paying off all tort judgments under $1,000 within thirty days while delaying payment of judgments over $1,000 violated equal protection. *Evans I*, 689 F.2d at 1300. It is this *Evans I* holding that we must now review to determine whether it was clearly erroneous and should be reversed.

■ The equal protection clause "commands that states treat similarly situated people in a similar manner." *Faheem–El v. Klincar*, 841 F.2d 712, 727 (7th Cir.1988) (en banc). *See City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). The first question presented is what standard of review this court should use in examining the validity of the City's practice. *Griffin High School v. Illinois High School Ass'n*, 822 F.2d 671, 674 (7th Cir.1987). The court initially must determine whether the practice infringes on a fundamental right or discriminates on the basis of a suspect classification. *Faheem–El*, 841 F.2d at 727. Here, the classification made by the City is between holders of judgments larger than $1,000 and holders of judgments smaller than $1,000. This categorization does not implicate any fundamental right and it is not a suspect classification. When no suspect class or fundamental right is involved, the court must apply a very deferential rational basis test. Under this test, "legislation is presumed to be valid, and will be sustained as long as the classification drawn by the statute is rationally related to a legitimate state interest." *Griffin*, 822 F.2d at 674. *See also City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254; *Vaden v. Village of Maywood*, 809 F.2d 361, 365 (7th Cir.), *cert. denied*, 482 U.S. 908, 107 S.Ct. 2489, 96 L.Ed.2d 381 (1987).

The court in *Evans I* applied the rational basis test and concluded that the City's practice was not rationally related to a legitimate state purpose. In *Evans I*, the City argued that its practice "related rationally to the City's attempt to reduce litigation and interest costs by encouraging quick settlements for $1,000 or less without interest in a large amount of nuisance litigation." *Evans I*, 689 F.2d at 1299. The *Evans I* court examined this rationale and found it wanting. The court noted that the City paid fully litigated claims under $1,000 and the court questioned whether the practice would reduce interest costs since interest would accumulate at the statutory rate on the unpaid judgments. *Id.* The *Evans I* court could "discern no rational basis for the City's challenged classification." *Id.* at 1300.

The City urges us to reverse this finding and find that its practice does not violate equal protection. In addition to the reasons presented to the court in *Evans I*, the City presented other explanations of its practice at the second trial. A former city comptroller testified that the prioritization was designed to accommodate a large number of small tort judgment creditors and reduce the total number of creditors waiting for payment. Since a large number of small judgments could be paid with the limited amount of money in the 395 Fund, the total number of judgment creditors awaiting payment at any one time could be reduced. Small judgment holders were thus spared the lengthy waits experienced by large judgment holders and the City argues that plaintiffs failed to prove that the priority payments to small judgment creditors actually increased the delays experienced by large judgment creditors.

The reasons presented by the City for the practice are by no means compelling. While the policy choice to pay judgments under $1,000 before paying judgments over $1,000 may not be a civics textbook example of good government, this court does not judge governmental actions by that standard. A governmental classification that does not affect a suspect class or fundamental right must be upheld "unless no

reasonably conceivable set of facts could establish a rational relationship between the classification and an arguably legitimate end of government." Nowak, Rotunda, Young, *Constitutional Law* (2d ed. 1983). Governments must be given wide latitude in these types of regulations. *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254; *Vaden*, 809 F.2d at 365. If a government decision is improvident, the political process and not the court has the responsibility for rectifying any error. *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254.

Under this extremely deferential standard, it is clear that the classification system set up by the City should not be struck down by this court. The City offered a number of reasons for its classification system. Most importantly, at the second trial the City argued that paying off smaller judgments early satisfied more claimants; without such a bifurcation of payments, all tort judgment creditors would have experienced lengthy delays. The district court found that the purpose of satisfying more claimants was invalid. However, we find nothing to indicate that such a goal is impermissible. The purpose behind a government enactment need not be laudatory—to pass constitutional muster, the purpose must simply be legitimate. If the court can hypothesize plausible reasons for legislation that are within the legitimate goals of a government, nothing else is required to validate the governmental classification and it does not matter whether the reasons advanced actually motivated the legislative action. *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980). Vicious or irrational discrimination violates the equal protection clause. *Jackson v. City of Joliet*, 715 F.2d 1200, 1203 (7th Cir.1983), *cert. denied*, 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984). No such discrimination is evident in this case. At worst, the City is merely attempting to satisfy as many individual claimants as possible with the limited revenues available. The City's practice of paying small tort judgments in advance of larger ones does not violate the equal protection rights of the holders of large tort judgments. This court's finding in *Evans I* that the City's practice violated equal protection was clearly erroneous and must be reversed.

## C. *Evans II* Equal Protection

■ At the second trial, plaintiffs presented and the district court approved a second theory of liability. The district court found that the City's practice of delaying tort judgment payments from the 395 Fund while paying other nontort judgments promptly was a separate equal protection violation. In essence, the district court held that to avoid violating the equal protection clause, the City must establish a single order of payment for all judgments of any kind entered against it. The district court also found that since the City was able to pay some types of judgments, such as enterprise or contract judgments, in a timely manner it must raise enough revenue to pay off all outstanding judgments just as promptly. The district court held that the City's "chronic underbudgeting" was itself a violation of equal protection. The court found that the City could not claim poverty as an excuse for delaying payments to some creditors while at the same time promptly satisfying the claims of others; the court discounted the City's budgetary policy of keeping separate accounts and found that there could be no rational distinction between the tort judgment owned by the plaintiffs and other judgments paid off in a preferential manner by the City.[14]

Under the City's budgetary scheme, judgments are to be paid out of different city funds depending on the origin of the claim. Enterprise judgments are paid from

---

**14.** The plaintiffs also argue that, beyond its practice of classifying and prioritizing judgments under its budgetary scheme, the City also often paid judgments out of order for unknown or suspicious reasons. As an example of such conduct, the plaintiffs note that money was paid promptly for injuries sustained when former Mayor Daley's limousine hit another car. The district court found that there was insufficient evidence to prove that the City had a custom or practice sufficient to trigger 42 U.S.C. § 1983 and we will not disturb that finding.

revenues generated by the enterprises themselves. Contract judgments are paid from departmental funds. Judgments arising out of employment-related litigation are usually payable from the personnel budgets of the affected departments. The 395 Fund is supposed to pay for all remaining tort judgments. The 395 Fund is a special revenue fund that can only be used for a defined purpose—part of the property tax is earmarked for that purpose. The City argued that this system of budgeting made it impossible to pay off all judgments on an equal basis. The district court was unconvinced. While acknowledging that the City's system of budgeting may have made good accounting sense, the court found that it could not explain the disparate treatment. The court noted that tort judgments could also have been charged to specific departments, as other judgments were. Alluding to the personnel judgments charged to departments, the court noted that the City had stated that such matching of costs to departments would act as a deterrent to future misconduct. The court reasoned that other kinds of conduct leading to tort judgments, such as police brutality cases, should be charged back to departments as well. The court found the City's differentiation between tort and nontort judgments to be irrational.

In reviewing this holding by the district court, we must again apply the rational basis test of equal protection to the City's practice. Under this standard, the City's budgetary scheme does bear some rational relationship to legitimate state ends. The City's practice of charging judgments incurred by enterprise funds to those funds seems rationally related to the concept of such a fund—a self-sustaining or break-even operation supported by its users. Charging departmental budgets for contract damages conforms to the normal accounting practice of matching expenditures to the appropriate entity that incurred the liability. Similar rational reasons exist for charging personnel damages to the involved department. The 395 Fund is by law a special revenue fund and can only be used for its defined purpose.

The district court found fault with this system and while it may not be perfect, we do not believe that it sinks to the level of being irrational. Under the equal protection analysis, the City's practices can be rationally related to the legitimate interests involved in maintaining a workable budgetary scheme. It is not this court's province to prescribe the budgetary workings of the City of Chicago. Such things are beyond the expertise of the judiciary. *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 41, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973). While it may have been more logical, as the district court pointed out, to charge all judgments back to the responsible departments, the City's lack of symmetry in its policy does not constitute an equal protection violation. *See Dandridge v. Williams*, 397 U.S. 471, 485–86, 90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491 (1970) (failure of state to make perfect classifications not equal protection violation).

■ Likewise, the district court's holding that the equal protection clause demands that the City raise more tax revenue to meet all obligations promptly is not warranted under the rational basis test. A City must consider many things when assessing taxes. Determining an appropriate level of taxation is fundamentally a local decision. As Justice Powell noted, "we stand on familiar ground when we continue to acknowledge that the Justices of this Court lack both the expertise and the familiarity with local problems so necessary to the making of wise decisions with respect to the raising and disposition of public revenue." *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. at 41, 93 S.Ct. at 1301. This court must avoid attempting to determine for itself whether the City is able to raise more revenue. Such a decision is better left to local taxpayers acting through their elected officials. The City's alleged failure to raise adequate revenue to quickly meet all its tort judgment obligations does not violate equal protection.

The district judge advanced some worthy ideas, but they are for the City's self-determination, and will not be imposed by this court. It is regrettable that this matter

which has lingered so long now takes a new and possibly unexpected turn, but what we now view as error must be arrested even at so late a date. Improvements in this situation are better left to the state and municipal governments.

### III. CONCLUSION

Our decision in *Evans I* was clearly erroneous in its conclusion that the City's practice of prioritizing tort judgments under $1,000 denied the plaintiffs the equal protection of the laws. To that extent we overrule *Evans I.*[15] We find that the City's failure to establish a single order of payment of all judgment creditors did not violate equal protection. Therefore, the decision of the district court is REVERSED. Costs are waived.

---

**15.** There is some question as to what effect we must give to the due process language in *Evans I. See supra* note 11. The district court in *Evans II,* while acknowledging the due process findings in *Evans I,* did not base its holding on any due process violation. The district court decided this case solely on equal protection grounds and damages were awarded on that basis alone. The parties to this appeal also did not raise any issue of due process. The due process claim has not survived to this stage of the litigation.