ELI STEINBERG *et al.*, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs-Appellees, v. SYSTEM SOFTWARE ASSOCIATES, INC., *et al.*, Defendants-Appellees.

First District (5th Division) No. 1—97—3952

Opinion filed June 18, 1999.

Dom J. Rizzi, Marvin A. Miller, Patrick E. Cafferty, and Jennifer Winter Sprengel, all of Miller, Faucher, Cafferty & Wexler, L.L.P., and Michael J. Freed, Joseph D. Ament, and Edith F. Canter, all of Much Shelist Freed Denenberg Ament Bell & Rubenstein, P.C., both of Chicago, and Robert M. Kornreich and Wallace A. Showman, both of Wolf Popper, L.L.P., Sanford P. Dumain and Lori G. Feldman, both of Milberg Weiss Bershad Hynes & Lerach, L.L.P., Lawrence G. Soicher, of Law Offices of Lawrence G. Soicher, and Stanley M. Grossman and Patrick V. Dahlstrom, both of Pomerantz Haudek Block & Grossman, all of New York, New York, and Steven J. Toll, of Cohen, Milstein, Hausfeld & Toll, P.L.L.C., of Seattle, Washington, and Mark Willis, of Cohen, Milstein, Hausfeld & Toll, P.L.L.C., of Washington, D.C., and Glen DeValerio, of Berman, DeValerio & Pease, L.L.P., and Richard Vita, of Law Offices of Richard Vita, both of Boston, Massachusetts, for appellants.

Arthur T. Susman, Charles R. Watkins, and Robert J. Emanuel, all of Sus-

man & Watkins, and Ronald L. Futterman, of Futterman & Howard, Chartered, both of Chicago, and Jeffrey H. Squire, of Kaufman Malchman Kirby & Squire, L.L.P., of New York, New York, for appellee Eli Steinberg.

Lowell E. Sachnoff, Michael J. Kaufman, and Gary S. Caplan, all of Sachnoff & Weaver, Ltd., of Chicago, for appellees System Software Associates, Inc., Roger E. Covey, Terence H. Osborne, Terry E. Notari, and Joseph Skadra.

JUSTICE THEIS delivered the opinion of the court:

Plaintiff-appellee, Eli Steinberg[1] (Steinberg), filed a class action complaint in the circuit court of Cook County, Illinois, on January 8, 1997, against defendants-appellees, System Software Associates, Inc. (SSA), and certain of its officers (Roger E. Covey, Terence H. Osborne, Terry E. Notari, and Joseph Skadra). Steinberg, on behalf of a class of purchasers of SSA common stock, sought damages for alleged violations of the Illinois Securities Law of 1953, as amended (815 ILCS 5/1 *et seq.* (West 1996)), common law fraud, the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 (West 1996)), and negligence. Steinberg's complaint stemmed from SSA's use of allegedly overly aggressive accounting practices and revenue recognition policies.

The day after Steinberg's class action complaint was filed, the appellants, federal class action plaintiffs and objectors below to the circuit court class action settlement (the Objectors), filed a federal securities fraud class action against the same defendants in the United States District Court for the Northern District of Illinois, seeking damages based on essentially the same set of facts.[2] Defendants moved to dismiss the consolidated federal complaint and, pursuant to the Private Securities Litigation Reform Act of 1995 (the PSLRA) (15 U.S.C.A. § 78u—4(b)(3)(B) (West 1997)), pretrial discovery in the federal court class action was automatically stayed. The Objectors now appeal from the final judgment of dismissal of the circuit court class action entered on September 30, 1997, and the circuit court's order of October 8, 1997, denying the Objectors' petition to intervene. We affirm.

---

[1]This action was brought on behalf of a class of purchasers of the common stock of System Software Associates, Inc., during the period from November 21, 1994, through January 7, 1997. At the time of the settlement, plaintiff Sontag withdrew from the case, and the stipulation was entered on behalf of plaintiff Steinberg only.

[2]The federal class period begins three months earlier and covers August 22, 1994, through January 7, 1997.

BACKGROUND

Defendant SSA develops business information systems for large, industrial sector companies. An October 5, 1995, Wall Street Journal article disclosed that SSA's revenue recognition policies may have been "overly aggressive" in recording certain sales for which it had not yet been paid or on which payment might be withdrawn in the future. The day before Steinberg's complaint was filed, SSA announced that it was restating its revenues and earnings for fiscal years 1994 and 1995, as well as for the first three quarters of 1996.

While discovery was stayed in the federal court, plaintiffs in the circuit court filed discovery requests. In response to those requests, defendants produced approximately 20,000 pages of documents to plaintiff's counsel during April 1997. Documents were subpoenaed from SSA's accountant, Price Waterhouse, which produced approximately 40,000 pages of documents on April 2, 1997. Roger Covey, chairman and chief executive officer of SSA, and Joseph Skadra, chief financial officer of SSA, also gave confirmatory depositions, disclosing their financial condition. The discovery materials obtained in the circuit court class action were later made available to lead counsel in the federal class action.

Settlement discussions began between the parties to the state court class action suit. The parties, unable to reach an agreement, employed a mediator. The mediation resulted in an agreement in principal to a settlement. Pursuant to section 2—806 of the Illinois Code of Civil Procedure (735 ILCS 5/2—806 (West 1996)), the parties applied for an order approving settlement of the lawsuit in accordance with a settlement agreement dated June 26, 1997 (the Agreement).

Under the terms of the Agreement, SSA would pay the plaintiff class $1,700,000 in cash and interest accruing from May 29, 1997, to the date of deposit. Covey was to contribute 100,000 shares of SSA stock with a guaranteed minimum worth of $5 per share. Therefore, the guaranteed minimum settlement value was $2,200,000. Following the settlement hearing, in September 1997, plaintiffs sold the SSA stock and converted it to cash at prices ranging from $12^7/8$ to $13^1/8$ per share. Thus, the value of the settlement ultimately exceeded $3 million.

On June 27, 1997, the circuit court entered an order certifying the class for settlement purposes and granting preliminary approval of the settlement set forth in the Agreement. By that order, the circuit court also provided that a settlement hearing be held on September 5, 1997, to determine whether the Agreement was fair, just, reasonable, adequate, in the best interest of the class, and should be approved. In addition, the circuit court's order of June 27, 1997, approved the notice

proposed, as to form and content, noted the manner by which class members were to request exclusion from the class, and specified that any member of the class may appear at the settlement hearing and show cause why settlement should not be approved.

By letter dated July 15, 1997, counsel for the defendants informed the judge presiding over the federal class action of the developments in the circuit court regarding settlement. Lead counsel in the federal action were also notified of the circuit court settlement by their receipt of a copy of that letter. Defendants were represented by the same counsel in circuit court and federal court.

Attached to defendants' circuit court brief, filed in support of the settlement, was a letter from the mediator to the presiding judge in the circuit court action, dated September 3, 1997. By his letter, the mediator noted that the case settled "after much give and take." The mediator further noted in the letter:

"There can be no doubt that the financial condition of the company, over which the greater part of our time and effort was spent, and which was clearly, fully, and unmistakably established to the satisfaction of both sides, including that of the mediator, was a key factor in bringing this matter to a reasonable conclusion."

SSA'S FINANCIAL CONDITION

At the September 1997 settlement hearing, counsel for the Objectors noted his awareness of SSA's precarious financial condition at the time the settlement agreement was being negotiated. By affidavit attached to defendants' brief in support of final approval of the proposed settlement, Skadra, SSA's chief financial officer, attested to the truthfulness of the following statements regarding SSA's financial condition. In early 1997, SSA faced a serious liquidity crisis caused primarily by a lack of revenue and profitability over the immediately preceding five quarters and by the high debt-equity leverage in SSA's capital structure. Investment bankers involved in SSA's attempt to refinance expressed concern that the pending class actions could be resolved without a material impact on SSA's financial statement.

In the spring of 1997, while negotiations with plaintiffs were underway, SSA began negotiating with potential investors to accomplish the recapitalization of its balance sheet. During that time, SSA began negotiating for a refinancing with Bain Capital, Inc. (Bain), an investment banking group. Thereafter, other investment banking firms expressed interest in facilitating SSA's refinancing. Prior to the settlement hearing, SSA accomplished its refinancing, and its financial situation had improved significantly.

OBJECTIONS RAISED BEFORE THE CIRCUIT COURT

On August 22, 1997, the Objectors filed a petition to intervene in the circuit court suit. The Objectors maintained: (1) that their status as class members in the circuit court and as plaintiffs in the federal suit conferred upon them the "right to know fully all of the details of any negotiations leading to the proposed settlement"; (2) that they should be allowed to intervene to take discovery to protect their rights; and that (3) intervention was warranted as the representation of their interests by existing parties may be inadequate.

■ By accompanying motion also filed on August 22, 1997, the Objectors complained the proponents of the settlement had failed to show that the compromise was fair and reasonable under each of the factors delineated in *City of Chicago v. Korshak*, 206 Ill. App. 3d 968, 972, 565 N.E.2d 68, 70 (1990) (the *Korshak* factors). The *Korshak* factors include: (1) the strength of the case for plaintiffs on the merits, balanced against the money or other relief offered in settlement; (2) the defendant's ability to pay; (3) the complexity, length and expense of further litigation; (4) the amount of opposition to the settlement; (5) the presence of collusion in reaching the settlement; (6) the reaction of members of the class to the settlement; (7) the opinion of competent counsel; and (8) the stage of the proceedings and amount of discovery completed. *Korshak*, 206 Ill. App. 3d at 972, 565 N.E.2d at 70. Before the circuit court, as on appeal, the Objectors' various complaints of unfairness stemmed, in large part, from their interpretation of recent federal legislation governing class action securities litigation. Consequently, a brief explication is required in order to place the Objectors' arguments in context.

■ The Private Securities Litigation Reform Act of 1995, the PSLRA, raised the pleading burden for fraud (15 U.S.C.A. §§ 78u—4(b)(1), (b)(2) (West 1997)), imposed mandatory sanctions for frivolous pleadings and motions (15 U.S.C.A. § 78u—4(c) (West 1997)), insulated certain projections and forecasts against claims of securities fraud (15 U.S.C.A. § 78u—5 (West 1997)), and made it more difficult to establish joint and several liability for violations of certain federal securities laws (15 U.S.C.A. § 78u—4(g) (West 1997)). The PSLRA also provides that discovery in a federal class action is automatically stayed upon the filing of a motion to dismiss (15 U.S.C.A. § 78u—4(b)(3)(B) (West 1997)). In addition, under the PSLRA, the party with the largest financial interest is ordinarily entitled to become the lead plaintiff and selects the class attorney (15 U.S.C.A. § 78u—4(a)(3)(B)(iii) (West 1997)).

Shortly after promulgation of the PSLRA, the United States Supreme Court held in *Matsushita Electric Industrial Co. v. Epstein*,

516 U.S. 367, 134 L. Ed. 2d 6, 116 S. Ct. 873 (1996), that state court class action settlements can release exclusive federal claims. However, under certain circumstances, state court class action settlements purporting to release the claims of federal class action plaintiffs are subject to collateral attack in federal court.

■ Following the Supreme Court's decision in *Matsushita*, the Securities Litigation Uniform Standards Act of 1998 (the Uniform Standards Act) (15 U.S.C.A. § 77a *et seq.* (West Supp. 1999)) was passed, amending the Securities Act of 1933 (15 U.S.C.A. § 77a *et seq.* (West 1997)) and the Securities Exchange Act of 1934 (15 U.S.C.A. § 78a *et seq.* (West 1997)). The Uniform Standards Act amended section 16 of the Securities Act of 1933 (15 U.S.C.A. § 77p (West 1997)) to require that certain securities fraud class actions involving nationally traded securities be brought in federal, not state, court (15 U.S.C.A. § 77p(b) (West Supp. 1999)). An additional amendment provides that any such action brought in state court involving a covered security shall be removable to the federal district court for the district in which the action is pending (15 U.S.C.A. § 77p(c) (West Supp. 1999)). The Uniform Standards Act is not applicable in this instance and applies only to actions filed after the date of its enactment.

OBJECTIONS BEFORE THE CIRCUIT COURT

The Objectors' arguments before the circuit court, though grounded in *Korshak*, were informed by the PSLRA and the perceived potential for unfairness implicit in *Matsushita*. The Objectors argued that the circuit court should not allow the plaintiff in the state court class action to "circumvent the Reform Act and highjack the federal action simply by virtue of accepting a low bid." As to *Korshak* factor number five, the presence of collusion, the Objectors maintained that, regardless of the purported merit of the settlement, the defendants had attempted to manipulate "the process" and "sandbag" the Objectors by excluding lead counsel in the federal class action from the circuit court settlement negotiations.

SETTLEMENT HEARING

At the settlement hearing on September 30, 1997, the discussion centered on SSA's ability to pay and the significance of the fact that SSA's financial condition had improved in the four months following agreement as to the terms of the settlement. The Objectors argued the court should consider SSA's changed circumstances in evaluating the settlement's fairness. They maintained that SSA's changed circumstances were foreseen at the time of the settlement, that the settlement was and is not necessary to SSA's financial prosperity, and that

the fairness of the settlement at the time of final approval rather than at the time of negotiation and agreement should control. Consequently, the circuit court questioned the parties regarding SSA's financial condition at the time of the settlement negotiations and at the time of the settlement hearing. The circuit court specifically inquired of the mediator whether he was concerned that SSA's financial condition might improve or that SSA might obtain financing. The mediator responded that he "never saw a glimmer of hope from either side with respect to what could have happened" and that the "[p]otential for financing was very grim." The mediator explained that it was his understanding that SSA either had a loan or was about to get one at very unfavorable rates and that he told the plaintiffs, "you want a company, I can get you a company."

Defendants hired Charles C. Cox (Cox) to render an expert opinion on the issue of damages independent of the issue of liability. Cox's opinion, submitted by affidavit dated September 11, 1997, was attached to defendants' brief in support of final approval of the settlement. Cox, senior vice-president of Lexicon, Inc., a consulting firm that specializes in the application of economics to legal and regulatory issues, served as commissioner of the United States Securities and Exchange Commission (SEC) from 1983 to 1989 and was acting chairman of the SEC in 1987. Assuming liability could be shown and using SSA's disclosure of January 7, 1997, as the curative disclosure, Cox calculated that damages for the entire alleged class period would amount to $3,129,969. Cox further calculated that, if his analysis were to take into account the effect of SSA's alleged partial disclosure to the marketplace on November 4, 1996, alleged damages would amount to $4,400,000. Cox stated that, even if the damages of the two announcement periods were considered together, the settlement value of $3,200,000 would amount to approximately 42% of this damage calculation, an amount Cox opined was "well within reason in light of questioned liability and SSA's poor financial condition at the time of the settlement." The Objectors do not challenge these damage calculations, but do suggest that the circuit court case was unfairly settled for litigation costs.[3]

ANALYSIS

With this context in mind, we turn to the Objectors' specific complaints on appeal. The Objectors assert: (1) the trial court erred as

---

[3]New restrictions limit damages to the difference between an investor's purchase price and the 90-day average trading price of the stock following any curative disclosure. 15 U.S.C.A. § 78u—4(e) (West 1997).

a matter of law as to the proper standard for reviewing a proposed class action settlement; (2) the named plaintiff and his counsel inadequately represented the class' interests in settlement negotiations; (3) the trial court erred in certifying a class for settlement purposes without making the findings required by section 2—801 of the Illinois Code of Civil Procedure (735 ILCS 5/2—801 (West 1996)); and (4) the trial court erred in denying the Objectors' petition to intervene.

As a threshold matter, we must first determine whether each of the issues presented on appeal is properly before us. The Objectors have appealed from two orders: from the order and final judgment of dismissal entered September 30, 1997, and from the order denying the Objectors' petition to intervene entered October 8, 1997. Defendants correctly note that the Objectors have not appealed from the order of June 27, 1997, certifying the class represented by the named plaintiff and his counsel. Consequently, defendants maintain this court lacks jurisdiction to review Objectors' arguments regarding the settlement class' certification and the named plaintiff's adequacy.

■ "It is well established that an appellate court has jurisdiction only of those matters which are raised in the notice of appeal." *Lewanski v. Lewanski*, 59 Ill. App. 3d 805, 815, 375 N.E.2d 961, 968 (1978). To that end, Illinois Supreme Court Rule 303 provides that the notice of appeal "shall specify the judgment or part thereof *** appealed from and the relief sought from the reviewing court." 155 Ill. 2d R. 303(b)(2). However, the notice of appeal is to be liberally construed as a whole. *Glassberg v. Warshawsky*, 266 Ill. App. 3d 585, 591, 638 N.E.2d 749, 753 (1994). Moreover, an appeal from a final judgment draws into issue all prior nonfinal orders which produced the final judgment. *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 433, 394 N.E.2d 380, 382 (1979). Thus, an unspecified judgment is reviewable if it is a " 'step in the procedural progression leading to the judgment specified in the notice of appeal.' " *Taylor v. Peoples Gas Light & Coke Co.*, 275 Ill. App. 3d 655, 659, 656 N.E.2d 134, 138 (1995), quoting *Burtell*, 76 Ill. 2d at 435, 394 N.E.2d at 383.

■ First and foremost, we note that the Objectors did not directly raise the issue of the propriety of class certification *per se* in the circuit court. There, as here, the Objectors chose an indirect path of attack: they attacked class certification by means of an assault on the fairness of the settlement. With respect to the propriety of class certification, we further note that the Objectors were themselves engaged in class action litigation derived from the same set of facts in federal court.

In *Cunningham Courts Townhomes Homeowners Ass'n v. Hynes*, 163 Ill. App. 3d 572, 575-76, 517 N.E.2d 1102, 1105 (1987), this court

declined to consider whether the named plaintiffs certified as class representatives were similarly situated with the class where the notice of appeal did not request a review of the order that certified the class. Here, the Objectors failed to appeal from the order of the circuit court certifying the class, and the notice of appeal, even when read broadly, does not reference or allude to the issue of class certification. Nor was the issue of class certification directly engaged below. Accordingly, we decline to consider whether the trial court erred in certifying the class for settlement purposes.

Nevertheless, for purposes of clarification, we do respond to the Objectors' selective references to *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 138 L. Ed. 2d 689, 117 S. Ct. 2231 (1997). In *Amchem*, the Supreme Court found several requirements for class certification were lacking where, for purposes of effectuating a global settlement as to asbestos litigation, the settlement class included both exposure-only plaintiffs and those presently injured. In that context, the Supreme Court decided the role settlement may play in determining the propriety of class certification. The Supreme Court concluded:

> "Confronted with a request for settlement-only class certifica-
> tion, a district court need not inquire whether the case, if tried,
> would present intractable management problems [citation], for the
> proposal is that there be no trial. But other specifications of the
> Rule—those designed to protect absentees by blocking unwarranted
> or overbroad class definitions—demand undiluted, even heightened,
> attention in the settlement context." *Amchem*, 521 U.S. at 620, 138
> L. Ed. 2d at 710, 117 S. Ct. at 2248.

We find nothing in *Amchem* to suggest that the circuit court abused its discretion or failed in its application of the law when it certified the class for purposes of settlement.

Though we decline to consider the issue of class certification, we will consider the due process concerns raised by this appeal, noting that the context of this litigation and the content of the Objectors' petition to intervene place those issues squarely before us. Initially, we observe that the Objectors' arguments here, as below, are premised upon their belief that they, by virtue of their status under the PSLRA, should have been apprised of the settlement negotiations before release of the notice of the proposed settlement. Had they been so informed, the Objectors maintain they would have ensured that the settlement was the product of adequate representation and the adversarial process, that the settlement class and release were precisely and accurately defined, and that notice was proper. These assertions, though advanced in the academy, do not suggest that the absence of Objectors' counsel from the settlement negotiations was erroneous as a

matter of law or resulted in cognizable harm. See M. Kahan & L. Silberman, *Matsushita And Beyond: The Role Of State Courts In Class Actions Involving Exclusive Federal Claims*, 1996 Sup. Ct. Rev. 219, 255-56 (1996) (observing that a state court "should invite counsel for the federal plaintiffs, and in particular counsel for the lead plaintiff if one has been appointed, to a preliminary fairness hearing" (emphasis omitted)).

■ We find no support for the notion that the Objectors' mere exclusion from the settlement negotiations rendered the settlement unfair as a matter of law. To be sure, global class action settlements, state court settlements that release exclusive federal claims, raise issues of fairness and process that extend beyond those present in non-global settlement class actions. These concerns include the fear of inadequate prosecution or discovery, the presence of collusion or "plaintiff shopping," attorney inexperience, and the settlement's potentially preclusive effect on federal claims. Despite these concerns, and the recent promulgation of the Uniform Standards Act notwithstanding, "Congress contemplated the possibility of dual litigation in state and federal courts related to securities transactions." *Orman v. Charles Schwab & Co.*, 179 Ill. 2d 282, 293, 688 N.E.2d 620, 625 (1997), citing *Matsushita*, 516 U.S. 367, 134 L. Ed. 2d 6, 116 S. Ct. 873 (for the proposition that Congress contemplated the possibility of dual litigation).

In *Matsushita Electric Industrial Co. v. Epstein*, 516 U.S. 367, 134 L. Ed. 2d 6, 116 S. Ct. 873 (1996), the United States Supreme Court held that a Delaware chancery court judgment settling shareholders' state and federal claims against an acquiring corporation had preclusive effect in federal courts under the Full Faith and Credit Act (28 U.S.C.A. § 1738 (West 1994)) even though the shareholders could not have pressed their federal claims in chancery court. Thus, *Matsushita* undercuts the Objectors' argument that their exclusion from the settlement negotiations necessarily meant that the product of those negotiations, the agreement, was unfair as a matter of law or that their status under the PSLRA as lead plaintiff in the federal matter required their presence and participation. The record itself undermines the Objectors' suggestion that their exclusion from the negotiations in fact prejudiced the plaintiffs.

Nothing in the record indicates that the concerns present in global class action settlements prejudiced the plaintiffs in this matter. The agreement was the product of adversarial give-and-take overseen by an experienced mediator. Class members received notice and the opportunity to opt out or to participate in the settlement. Out of the 19,000 notices sent, five class members representing an estimated

1,250 shares of SSA stock requested exclusion from the class. The amount of stock represented is an estimate because one class member who requested exclusion did not indicate how many shares of SSA stock he held during the class period. We find no support in the record for the Objectors' claims that prosecution and discovery were inadequate. All parties were represented by able counsel with extensive experience in class action securities litigation. Nor do we find discovery was inadequate. As the circuit court noted, 60,000 pages of discovery were obtained and made available to the Objectors, though discovery in the federal suit was stayed. Despite the Objectors' insinuations, the particular facts of this case do not suggest the presence of collusion or "plaintiff shopping." As for the settlement's potentially preclusive effect on the federal claims, we note that the circuit court was fully apprised that the allegations against SSA were the subject of dual litigation and was briefed on the relative merits of the state and federal claims.

Lastly, the Objectors' complaints regarding the supposed imprecision of the release and the quality of the notice afforded are more properly the subject of the federal litigation that remains after the state court settlement. There, the Objectors remain free to convince the federal court that this settlement was the product of inadequate representation and does not deserve full faith and credit.

■ Having exposed the premises upon which many of the Objectors' arguments of unfairness rest, we turn now to the question of fairness. As a general matter, we are asked to decide whether the circuit court abused its discretion or erred in its application of the law in finding that the settlement was fair, reasonable, and in the best interest of the class. "[T]he trial court's decision may be reversed only on a clear showing that the trial court was guilty of an abuse of discretion." *City of Chicago v. Korshak*, 206 Ill. App. 3d 968, 971-72, 565 N.E.2d 68, 70 (1990). "The standard to be used in evaluating the compromise settlement of a class action is that the agreement must be fair, reasonable, and adequate." *Langendorf v. Irving Trust Co.*, 244 Ill. App. 3d 70, 78, 614 N.E.2d 23, 28 (1992). "In a class action, the court is the guardian of the interests of the absent class members." *Waters v. City of Chicago*, 95 Ill. App. 3d 919, 924, 420 N.E.2d 599, 603 (1981).

■ The Objectors first contend the trial court misconstrued its role when it approved the settlement. We disagree. To support this argument, the Objectors reference the circuit court's statement that "it is most important that people be able to rely upon a handshake or acquiescence." The Objectors do not provide the context for the statement, discussion over whether SSA's improved financial condition should be

considered. In addition, the Objectors do not acknowledge what is clearly evident from the record: the circuit court's understanding of and attention to the complex legal and financial issues germane to the settlement before it. Having reviewed the record, we find that the circuit court correctly understood its role.

The strength of plaintiff's case on the merits balanced against the settlement amount· is the most important factor in determining whether a settlement should be approved. *Korshak*, 206 Ill. App. 3d at 972, 565 N.E.2d at 70-71. The record shows that the relative merits of the federal and the state claims were thoroughly briefed and vigorously argued before the circuit court. In fact, the court noted its sensitivity to the issues of liability when it stated for the record: "I have great question in my mind as to the total innocence of the officers of this company. *** So what I'm getting at, maybe this isn't as bad a case as [counsel for defendants] thinks it is." Moreover, it is apparent from the record that the circuit court was apprised of the particular problems posed by dual state and federal settlement class action securities litigation. In addition, the record indicates that the issue of damages was explored in context of the amount of damages potentially recoverable under the PSLRA. The record also shows, and the parties agree, that the circuit court properly focused its attention on SSA's ability to fund the settlement.

We now address the issue most vigorously argued at the settlement hearing, the significance of SSA's improved financial condition. Here, the Objectors maintain the trial court's analysis of the proposed settlement erroneously excluded SSA's then current financial condition. Again, we disagree.

As to the issue of the significance of SSA's improved financial condition, the Objectors' assertions are threefold: (1) SSA's financial condition was not as dire as the mediator was led to believe it was at the time of the settlement negotiations; (2) at the time of the negotiations, the parties did not inform the mediator that SSA's financial condition was improving or disclose to him the likelihood of significant financing in the near future; and (3) the fact that SSA's financial condition improved after it achieved its recapitalization rendered the previously negotiated settlement agreement unfair.

■ We turn first to the issue of SSA's financial condition at the time of the settlement negotiations. Specifically, the Objectors complain that the mediated settlement was unfair because it did not take into account "SSA's positive revenue, working capital, total stockholders' equity and the anticipated financing." Taking all these factors into account, the Objectors claim that, "as of June 27, 1997, the date the settlement agreement was entered, SSA's financial picture

was far from bleak." We find no merit in this argument given the position taken by the Objectors at the settlement hearing. There, counsel for the Objectors stated:

> "Your Honor, it is fair to say that SSA was in a severe, likewise, crisis, a higher settlement demand might well have dried up potential source[s] of capital and forced the company into bankruptcy.
>
> That was what was going on with the negotiations of this settlement. That's what brought about this settlement."

We turn next to the Objectors' second contention that, at the time of the negotiations, the parties did not inform the mediator that SSA's financial condition was improving or disclose to him the likelihood of significant financing in the near future. In support of these assertions, the Objectors point to the following exchange at the settlement hearing:

> "THE COURT: What about the potential for financing?
>
> [MEDIATOR]: Potential for financing was very grim. As a matter of fact, my recollection is that they either had a loan or were about to get one at very unfavorable rates. They were extremely unfavorable as I recall it. And that's the best they could get.
>
> If I were advising a client, I would tell them not to take that kind of a loan, but this situation, as a matter of fact, I think, I told the plaintiffs, you want a company, I can get you a company. And my ability—or the facts are here, the key factor certainly was finance. The financial condition of the company. But liability was strenuously argued."

■ We are not persuaded that this exchange constitutes evidence of collusive conduct on the part of counsel. When read in context, the exchange indicates what was obvious to all parties: the relationship between SSA's financial condition, the settlement negotiations, and the availability of financing. The plaintiffs, defendants, and objectors all admit that SSA's financial condition at the time of the settlement negotiation was dire. Moreover, the record indicates that SSA's ability to obtain financing was directly linked to its ability to resolve the claims at issue here.

In addition, we find no legal basis for the Objectors' contention that the circuit court erred in approving the settlement because SSA's financial condition at the time of the settlement hearing had improved. As a factual matter, we simply note that the settlement agreement itself contemplated the possibility that SSA's financial condition might improve upon recapitalization and hedged against that possibility by including 100,000 shares of SSA stock as part of the settlement amount. Circuit court plaintiffs' counsel stated at the settlement hearing:

"We bargained very hard and very long at the mediation progress over how do we protect ourselves in the event you get the financing, and in case the price of the stock goes up, and the solution that we came up with was the hundred thousand shares of stock we got."

Finally, we find no abuse of discretion in the circuit court's order denying the Objectors' petition to intervene. The federal class action plaintiffs chose to pursue their claims in federal, not state, court and were not necessary parties to the circuit court action. Therefore, we conclude that the circuit court did not err when it entered the final judgment of dismissal of the circuit court class action on September 30, 1997, and when it entered the order of October 8, 1997, which denied the Objectors' petition to intervene.

Affirmed.

HOURIHANE, P.J., and GREIMAN, J., concur.