2022 IL App (1st) 201197-U

THIRD DIVISION
May 4, 2022

No. 1-20-1197

_____

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| DAVE McCORMICK, ROBBY BROWN, T'LANI ROBINSON, DENNIS MAGANA, SCOTT SWINDELL, and DAVIS TOROSYNA, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| | ) | Appeal from |
| Plaintiffs-Appellees, | ) ) | the Circuit Court of Cook County |
| v. | ) ) | |
| | ) | 2018-CH-004872 |
| ADTALEM GLOBAL EDUCATION, INC., Formerly Known as DeVRY EDUCATION GROUP, INC., a Delaware corporation, and DeVRY UNIVERSITY, INC., a Delaware corporation, | ) ) ) ) | Honorable Michael T. Mullen, Judge Presiding |
| Defendants-Appellees | ) | |
| | ) | |
| (RICHARDO PEART, | ) | |
| | ) | |
| Objector-Appellant). | ) | |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.

O R D E R

¶ 1   *Held*: In class action, objector did not show that proposed settlement was unfair or that awarding plaintiffs' attorneys 35% of settlement fund was unreasonable.

¶ 2   Adtalem Global Education, Inc. and DeVry University, Inc., who jointly operated DeVry

University and Keller Graduate School of Management (collectively DeVry), were sued by Dave

McCormick and five others (collectively McCormick) as class representatives of students who

claimed that DeVry was able to recruit students and charge higher tuition between 2008 and 2016 by making misleading and deceptive statements about the income and employment statistics of DeVry graduates. McCormick sought actual damages for the tuition premium that they paid for a DeVry education, as well as equitable relief, statutory damages, and attorney fees. Two years later, McCormick reached a preliminary settlement agreement with DeVry, to which Richardo Peart objected. The trial court denied Peart's objections, gave final approval to the settlement as fair, reasonable, and adequate, and awarded 35% of the settlement as reasonable attorney fees for the "extraordinary" result that plaintiffs' counsel had negotiated despite DeVry's "thin" liability. Peart appeals the denial of his objections and approval of the settlement.

¶ 3    DeVry University was one of the country's largest for-profit colleges. In 2008, DeVry launched a nationwide advertising campaign in which it boasted of a high rate of job placements for its graduates and highlighted above-average salaries at the jobs which they secured. In 2016, the Federal Trade Commission (FTC) sought an injunction and tuition refunds from DeVry based on advertisements, marketing materials, and other recruitment efforts touting allegedly-deceptive representations about the advantages of holding a DeVry degree. The FTC claimed that DeVry misled consumers when stating that 90% of its graduates who actively sought jobs were able to secure them within their field within six months of graduation and that within one year of graduation, bachelor degree holders were earning an average of 15% more than the graduates of other institutions. That same year, the Department of Education pursued DeVry for its marketing practices. The FTC action resulted in an injunction prohibiting DeVry from misrepresenting how many of its graduates were able to secure jobs within their field of study. In addition, in late in 2016, DeVry settled with the two federal agencies by depositing $49.4 million toward tuition

refunds and providing $50.6 million for loan and debt relief to its former students. In July 2017, the FTC used DeVry's records to identify former students who were eligible for refunds and mailed 173,000 refund checks worth more than $49 million to those individuals. Not all of those checks were cashed. When there was money left in the fund in April 2019, the FTC mailed a second round of 128,875 checks totaling more than $9.4 million to individuals who had cashed their first check. According to appellant Peart's calculations, the average per student payment was $383.31. The FTC did not publicize how many students accepted their part of the $50.6 million in debt forgiveness that DeVry was obligated to provide as part of the settlement.

¶ 4    Other actions were filed around the country. There was a $27.5 million settlement in a securities lawsuit, and smaller settlements, including $2.25 million for consumer restitution with the state of New York and $455,000 with the Commonwealth of Massachusetts. This Illinois case was commenced in 2018.

¶ 5    In this Illinois action, a former DeVry student, Nicole Versetto, alleged that DeVry's false statements persuaded prospective students to enroll at its institutions instead of at similar colleges and to also pay a premium for their tuition. Versetto's claims were based on Illinois consumer protection statutes and the common law theories of fraud, breach of contract, breach of fiduciary duty, conversion, and unjust enrichment. DeVry filed a motion to dismiss which was stayed pending an attempt to mediate in February 2019. The parties' first attempt at mediation was unproductive and the litigation resumed with an amended complaint in March 2019 in which Dave McCormick was substituted as the plaintiff. DeVry's motion to dismiss McCormick's first amended complaint was subsequently granted, with leave to replead. Around this time, however, two similar actions against DeVry which students filed in Illinois federal court were dismissed

with prejudice and the second amended complaint that McCormick filed against DeVry was met with a motion to dismiss. See *Robinson v. DeVry Education Group, Inc.*, No. 16-CV-7447, 2018 WL 828050 (N.D. Ill., Feb. 12, 2018); *Polly v. Adtalem Global Education, Inc.*, No. 16-CV-9754, 2019 WL 587409 (N.D. Ill., Feb. 13, 2019). The tide that was seemingly in DeVry's favor shifted while McCormick and DeVry were briefing DeVry's motion, when motions to dismiss three similar suits in other parts of the country were denied. See *Rangel v. Adtalem Global Education, Inc.*, 2019 WL 682 (W.D. Tex., Dec. 13, 2019) (magistrate judge recommending that federal district court deny motion to dismiss); *Brown v. Adtalem Global Education, Inc.*, No. 19-00250-CV-W-ODS, 421 F. Supp. 3d 825 (W.D. Mo., 2019); *Robinson v. Adtalem Global Education, Inc.*, No. 19-CV-1505 (N.D. Ga., Nov. 25, 2019) (granting in part and denying in part motion to dismiss, with leave to replead); *Rangel v. Adtalem Global Education, Inc.*, Mar. 12, 2020 (district court accepting and acting on magistrate judge's report and recommendation filed on December 13, 2019 to deny motion to dismiss). Before DeVry's motion to dismiss McCormick's second amended complaint could be heard on January 13, 2020, the parties agreed to a second mediation.

¶ 6     During the mediation session on December 17, 2019, the parties reached an agreement in principle. Limited discovery ensued. This is the settlement at issue on appeal. For purposes of settlement, McCormick proposed to represent the class of approximately 323,000 individuals nationwide who paid for any part of a DeVry education between 2008 and 2018; and DeVry agreed to create a $44.95 million fund from which to pay the claims of class members, as well as notice costs and attorney fees. The parties agreed that class members who submitted valid claims would be entitled to a *pro rata* payment from the $44.95 million in proportion to their number of paid credit hours. By this they meant that if Claimant A paid for twice as many credit hours as Claimant

B, then Claimant A's *pro rata* share would be twice that of Claimant B's *pro rata* share. In addition to the *pro rata* payments, the parties agreed that associate and graduate degree holders who had been unable to find jobs within their fields of study within six months of graduation would be paid an additional $500; and their bachelor degree counterparts would be paid an additional $1000. It was also agreed that claims would be subject to an offset for debt forgiveness and money that claimants had already received from any of the federal and state government actions against DeVry, up to one-third of the fund. In addition, DeVry became obligated to provide career counseling services to graduates who were unable to find a job within their field of study within six months, and to request that the credit reporting bureaus delete negative credit events that DeVry had reported about student debt. The former students' release to DeVry preserved their right to seek loan forgiveness through the Department of Education's Borrower Defense to Repayment program.

¶ 7    On May 28, 2020, the trial court granted preliminary approval to the settlement agreement and ordered that notice be given to settlement class members by paper mail and e-mail. A professional class action claims administrator was retained to communicate with eligible individuals by mail, e-mail, website, and telephone.

¶ 8    Class member Peart, who was represented by counsel in Watkinsville, Georgia, filed an objection on September 22, 2020 to the court's final approval of the settlement, arguing primarily that he was better off pursuing "claims for debt cancellation" rather than participating in a settlement in which his compensation would be reduced or nullified by the payments he took in other settlements. (We note that the settlement preserved class members' right to seek debt forgiveness.) Peart also argued that the requested attorney fees were not reasonable.

¶ 9     In a declaration made on September 16, 2020 under penalty of perjury, the claims administrator stated that of 444,039 known class members, 53,132 individuals submitted claims. This response rate of slightly under 12% of potential claims was considered an "exceptional" response. Only a small number of settlement class members, 866, or about .91% of the settlement class, had opted out of the settlement. Only four settlement class members, including Peart, filed objections to the settlement. The objectors are .0009% of the settlement class.

¶ 10    After hearing arguments on the motion for final approval and objections, the trial court overruled the objections, noted that it "had given great thought to and *** considered all eight factors identified in the *City of Chicago v. Korshak* case *** and conclud[ed] that the proposed settlement is fair, reasonable, and adequate." The court gave final approval to the settlement and also reviewed McCormick's motion for attorney fees and granted the requested amount as reasonable. This appeal followed.

¶ 11    Peart's first of three arguments is that it was an abuse of discretion to approve a settlement that was not in the best interests of class members whose compensation will be offset, potentially entirely, by their compensation from DeVry's settlement with the Federal Trade Commission (FTC). Peart claimed and was paid $772.96 from the FTC settlement and contends that he will be "disadvantaged" when that amount either reduces or eliminates his share of the McCormick settlement. The exact amount of Peart's offset has not been stated by the settlement administrator, but depends upon the total number of paid credit hours of all former students who participate in the McCormick settlement. Peart contends the trial court should have obtained this data and specifically addressed it before giving approval. However, the payment offsets were "hardly mentioned" in the trial court, were not one of the judge's considerations, and should not be

analyzed for the first time on appeal because "that is not a function of an appellate court (not to mention impossible on this record)." Peart also argues that class members whose compensation is going to be reduced by their earlier compensation are being treated differently from first-time claimants, and that this is an intra-class conflict which entitled his subset of the class to the appointment of separate counsel.

¶ 12    A trial court's final approval of a class settlement is reviewed for an abuse of discretion. *Steinberg v. System Software Associates, Inc.,* 306 Ill. App. 3d 157, 169, 713 N.E.2d 709, 717 (1999). The abuse-of-discretion standard of review is the most deferential standard that is employed in an appeal. *In re D.T.*, 212 Ill. 2d 347, 356, 818 N.E.2d 1214, 1222 (2004). Under this standard, the question is not whether we would take the same view as the trial court, but only whether no reasonable person would take the same view. *Shaun Fauley, Sabon, Inc. v. Metropolitan Life Insurance Co.*, 2016 IL App (2d) 150236, ¶ 45, 52 N.E.3d 427.

¶ 13    There is strong public policy in favor of settling and the avoiding costly and time-consuming litigation. *Security Pacific Financial Services v. Jefferson*, 259 Ill. App. 3d 914, 919, 632 N.E.2d 299, 303 (1994); *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 784 (3rd Cir. 1995) ("the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); *In re School Asbestos Litigation,* 921 F.2d 1330, 1333 (1990) (there is a policy of "encouraging settlement of complex litigation that otherwise could linger for years").

¶ 14    "Many factors enter into the consideration of the parties to litigation in arriving at a compromise settlement. The result is achieved by each party weighing and assessing the strength and weakness of his position." *People* ex rel. *Wilcox v. Equity Funding Life Insurance Co.*, 61 Ill.

2d 303, 316, 335 N.E.2d 448, 456 (1975). "Given that a settlement is a compromise, a trial court is not to judge the legal and factual questions by the criteria employed in a trial on the merits." *Shaun Fauley*, 2016 IL App (2d) 150236, ¶ 45.

> "Approval should be given if the settlement offer is fair, reasonable and adequate. These general terms cannot be precisely defined. The Supreme Court has directed that a judge reach 'an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated' and to 'form an educated estimate of the complexity, expense, and likely duration of such litigation *** and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.' [Citations.]" *Wilcox*, 61 Ill. 2d at 317, 335 N.E.2d at 456.

See also *Steinberg*, 306 Ill. App. 3d at 169, 713 N.E.2d at 717. When assessing the fairness of a proposed settlement, some of the factors the trial judge should consider include:

> "(1) the strength of the case for plaintiffs on the merits, balanced against the money or other relief offered in settlement;
>
> (2) the defendant's ability to pay;
>
> (3) the complexity, length and expense of further litigation;
>
> (4) the amount of opposition to the settlement;
>
> (5) the presence of collusion in reaching a settlement;
>
> (6) the reaction of members of the class to the settlement;
>
> (7) the opinion of competent counsel; [and]
>
> (8) the stage of proceedings and the amount of discovery completed." *City of Chicago v. Korshak*, 206 Ill. App. 3d 968, 972, 565 N.E.2d 68, 70 (1990).

¶ 15    The record does not support Peart's contention that the trial court lacked sufficient information about the offset for the payments and debt forgiveness that were claimed in other settlements with DeVry and should have engaged in further analysis of the issue, or the contention that the settlement agreement is unfair to those individuals. The record shows that McCormick's counsel gave a detailed presentation of both the facts and law which provided the trial court with ample support for its discretionary decision to approve the settlement as fair, reasonable, and adequate.

¶ 16    The record shows, for instance, that McCormick submitted lengthy memos with his motions seeking preliminary approval and final approval of the settlement agreement. Length is not indicative of quality, but in this instance, both the preliminary and final motion memos were very informative. The memo regarding preliminary approval was 41 pages; outlined the relevant procedural history of the case; included a summary of settlement agreement; and also cited and applied legal authority regarding certification of the class for settlement purposes, naming the six plaintiffs as settlement class representatives, appointing settlement class counsel, giving preliminary approval to the settlement agreement, and approving the proposed notice and distribution. Attached to this memo was a copy of the settlement agreement. The memo regarding final approval was 51 pages, and was similar in content to the preliminary memo, but also addressed the objections that had been received. Its attachments included the settlement agreement, a declaration from the professional claims administrator, and an affidavit from McCormick's counsel.

¶ 17    In paragraph 2 of the settlement agreement that was twice submitted for the court's review, the parties specify that class members are entitled to compensation for the credit hours they paid

for and that an additional $500 or $1000 is owed to the degree holders who did not secure a job within their field of study within six months. Paragraph 2 then states that the compensation will be reduced or precluded by the debt forgiveness and other forms of compensation that former students have received from other forums, in order to prevent double recovery:

"2. SETTLEMENT RELIEF

2.1 Monetary Payments to Settlement Class Members.

a. Settlement Payments.

i. Each Settlement Class Member who submits an Approved Claim shall be entitled to a *pro rata* payment based on the number of DeVry and/or Keller credit hours that they have paid for. ***

* * *

ii. Settlement Class Members submitting an Approved Claim who have graduated from a DeVry associate's or bachelor's degree program or Keller master's degree program, but did not obtain employment in their fields of study within six (6) months of graduation, are entitled to a Graduate Payment in addition to their *pro rata* share described in Section 2.1.a.i. Those Settlement Class Members that graduated from a DeVry associate's degree program, but did not obtain employment in their fields of study within six (6) months of graduation, will be entitled to an additional payment of five hundred dollars ($500.00). Those Settlement Class Members that graduated from a DeVry bachelor's degree program, but did not obtain employment in their fields of study within six (6) months of graduation, will be entitled to an additional payment of one thousand dollars ($1,000.00). Those Settlement Class Members that graduated from a Keller

master's degree program, but did not obtain employment in their fields of study within six (6) months of graduation, will be entitled to an additional payment of five hundred dollars ($500.00). Graduate Payments will be paid solely from the Settlement Fund.

\*\*\*

b. Settlement Payment Offsets.

i. In order to prevent double recovery, the total payment to which a Settlement Class Member is otherwise entitled to pursuant to Section 2.1.a shall first be offset by an amount equal to: (i) any debt forgiveness or Borrower Defense to Repayment relief received by that Settlement Class member as of the Effective Date; and (ii) any cash payment and/or debt forgiveness, including but not limited to loan forgiveness and accounts receivable forgiveness, that the Settlement Class Member received pursuant to Defendants' settlements with the Federal Trade Commission, Department of Education, New York Attorney General and Massachusetts Attorney General ('Government Settlement Payments'). By way of example, if the total amount of debt forgiveness and Government Settlement Payments a Settlement Class Member already received is equal to or exceeds the amount of the cash payment to which the Settlement Class Member would otherwise be entitled to under this Settlement, the Settlement Class Member would not receive a settlement payment under the Settlement. If the total amount of debt forgiveness and Government Settlement Payments associated with a particular Settlement Class Member is less than the amount of the cash payment to which the Settlement Class Member would otherwise be entitled, the Settlement Class Member would receive a payment equal to the difference between the two—*i.e.* total settlement payment less the total amount of

debt forgiveness and Government Settlement Payments."

¶ 18 Thus, prior to oral argument, the trial court was fully apprised of the relevant facts, including details about the offset. The court also had benefit of Peart's written six-page objection in which his primary argument was, "Since the offset from the FTC settlement creates an intra-class conflict and may leave Mr. Peart and many thousands of other class members with zero recovery, the Court should deny final approval." Although unnecessary, toward the end of arguments, the trial judge even specified, "I have considered everything that has been submitted to me."

¶ 19 Neither Peart nor his Georgia-based attorney attended the final approval hearing. Nevertheless, Peart's offset argument was addressed by one of McCormick's attorneys, who stated the following:

"Mr. Peart's objection, from our perspective, primarily raises issues with respect to the offset mechanism in the settlement. He largely contends that it treats [groups of class members] differently, and therefore, unfairly, but really the opposite is true.

I think you have to look at this from DeVry's perspective, which is to say that DeVry has been litigating over these alleged misrepresentations with a number of different folks prosecuting claims in a number of different forums. Not just us here in this class action, but the FTC, for example, a couple of attorneys general as well.

Through those different pieces of litigation, including this settlement were it to be finally approved, DeVry has been issuing refunds to former students. From DeVry's perspective, it doesn't matter what mechanism those refunds are made through, whether it's through the FTC or this settlement or otherwise. Money is fungible at the end of the

day.

What does matter to DeVry, though, is that thus far, absent this settlement, only a limited number of its former students have actually been able to receive refunds. For example, the FTC settlement involved approximately 173,000 former students that were able, under the terms of that deal, to make claims. This case, as your Honor knows, involves several hundred thousand. So the point is that certain folks have already received refunds and others have not.

Here that mechanism would be offset and actually creates more fairness. What it does is it ensures that nobody is getting out ahead of anyone else. Everyone is starting at the same starting line. No one has an advantage in terms of having previously received funds and then getting more funds. So what it allows us to do here is ensure that everybody's refunds are accounted for once, and everybody has the same opportunity to claim under this settlement.

It's also important to note, your Honor, that this was a significant negotiating point for DeVry. I believe throughout our negotiations and I still believe today that DeVry would not have offered the same amount of money in the settlement fund absent this offset.

You know, there's some mention of Mr. Peart wanting additional debt relief that he doesn't get. That's not really tied to the offset at all, your Honor; and as I mentioned previously, this settlement specifically preserves his ability to seek additional debt forgiveness through the Department of Education."

¶ 20    Accordingly, we find that there is no basis for Peart's argument that payment offsets were "hardly mentioned" in the trial court or that it would be "impossible" from the record for a

reviewing court to address the topic. Furthermore, the quoted portion of the oral arguments effectively refutes Peart's contention that the offsets are unfair to him and others like him. The offset language ensures that all former students will be compensated equally and that "double" claimants such as Peart will not recover double compensation or double debt forgiveness through the McCormick litigation. During oral arguments, McCormick's attorney disclosed that the offset terms were "a significant negotiating point for DeVry," and thus were a key to reaching a settlement at all. There was no apparent reason to appoint separate counsel to represent Peart and others who are receiving the same compensation as their classmates. To the extent that Peart is arguing that the settlement is unfair in general, the trial court made a final determination that the class settlement was fair, reasonable, and adequate. In making this decision, the trial court reviewed the parties' written submissions, the four objections to the settlement, which included the objection filed by Peart, and heard arguments regarding all eight of the *Korshak* factors concerning fairness, reasonableness, and adequacy. *Korshak*, 206 Ill. App. 3d at 972, 565 N.E.2d 68. While Peart is apparently displeased by the settlement, his argument falls far short of meeting his burden to show that the trial court's ruling was an abuse of discretion.

¶ 21    Peart's second argument is that it was an abuse of discretion to award attorney fees as a percentage of the settlement when some of that money will revert to DeVry as unclaimable by class members who successfully took part in other settlements, primarily the FTC action. Peart estimates that up to 100,000 class members made claims in the FTC action and that this means only $30 million of the $44.9 million fund will be paid to claimants in the current action and the remainder of the fund will revert to DeVry. Peart's estimation is that awarding $15.7 million in attorney fees overcompensates counsel by $5.24 million. Peart's written objection to final approval

of the settlement included this argument and these figures. Peart's solution is that we order the trial court to reconsider the award, based on what Peart considers to be the "actual benefit" to the class.

¶ 22    This is not a persuasive argument. Peart is proposing that McCormick's counsel not be compensated for their advocacy and communication with the entire class for two years and for ultimately negotiating a settlement that benefits all class members. An attorney who recovers a common fund for the benefit of persons other than the attorney or the client is entitled to reasonable attorney fees from the fund as a whole, so as to prevent unjust enrichment to those other individuals. *Scholtens v. Schneider*, 173 Ill. 2d 375, 385, 671 N.E.2d 657, 662 (1996). As discussed below with regard to Peart's next argument about the attorney fees, the trial court based the award on the "extraordinary resolution" that McCormick's counsel achieved in this case despite DeVry's "thin" liability. McCormick and DeVry negotiated a compromise that gives a mix of financial and nonfinancial benefits to all the class members. Under the negotiated resolution of the case, class members are entitled to financial compensation which will, in some instances, be reduced or eliminated by the compensation those individuals already claimed in the other actions. In addition, class members' nonfinancial entitlements include preservation of the right to obtain loan forgiveness through the Department of Education's Borrower Defense to Repayment program, under which federal direct student loan borrowers who were defrauded by a school may seek forgiveness of their loans. Class members will also benefit from DeVry's obligation to ask the credit reporting bureau to delete negative events that were reported about their DeVry accounts. Class members are also entitled to continue using DeVry's career counseling services past the typical cutoff date for former students. Thus, due to counsels' advocacy, Peart and his fellow class members are receiving a package of financial and nonfinancial compensation in the present

without the expense, uncertainty, and time of further litigation. He may have preferred greater financial compensation and is arguing that attorney fees should be based strictly on financial payments. However, he cites no authority for that proposition and, in our opinion, it would be unjust for plaintiffs' counsel to have worked for and obtained "extraordinar[il]y" positive results for the entire class, despite "thin" grounds for negotiating with DeVry, yet be compensated for only a portion of the settlement. The attorneys' efforts created a common fund and the attorneys are equitably entitled to reasonable attorney fees for that work. *Scholtens*, 173 Ill. 2d at 385, 671 N.E.2d at 662.

¶ 23    Peart's final argument is that the attorney fee award of 35% of the settlement was "unreasonably high" and a "windfall" for a case that was actively litigated for less than two years, "never advanced beyond the motion to dismiss stage," and "piggybacked" on the FTC action. He contends the trial court should have required evidence of the legal work in order to perform a "lodestar" cross-check. He also argues that the judge's only stated reason for exceeding a 25% benchmark was being "very familiar with what appropriate fees are."

¶ 24    When determining a fee award in class action litigation, the trial court has discretion to use either the percentage-of-recovery or lodestar methods. *Brundidge v. Glendale Federal Bank, F.S.B.*, 168 Ill. 2d 235, 243-44, 659 N.E.2d 909, 914 (1995). In McCormick's motion for attorney fees, expenses, and incentive awards to the class representatives, McCormick contended that the percentage-of-the-recovery method of determining attorney fees was the most suitable in this case. Under the percentage-of-recovery approach, reasonable attorney fees are awarded as a percentage of the amount that counsel recovered on behalf of the class. *Brundidge*, 168 Ill. 2d at 238, 659 N.E.2d at 911. Under the loadstar approach, the reasonable value of services rendered, based upon

the number of hours that counsel worked, is increased by a multiplier which accounts for the complexity of the litigation, the contingent risk that counsel took on, and the benefit conferred upon the members of the class. *Brundidge*, 168 Ill. 2d at 239-40, 659 N.E.2d at 912.

¶ 25    In the motion, McCormick's counsel offered to provide the data and caselaw the court needed to perform a lodestar cross-check of the reasonableness of the fee award as determined under the percentage method, and cited *Shaun Fauley*, 2016 IL App (2nd) 150236, ¶ 59, for the proposition that the court was not required to use both methods. The trial judge did not, however, ask counsel to perform a lodestar calculation or submit their underlying records.

¶ 26    Peart cites no authority indicating that the lodestar method was preferrable to the percentage-of-recovery method in this instance, *i.e.*, that the trial judge's choice of methods was an abuse of discretion. He also cites no authority for his proposal that fees be calculated under both methods as a cross-check. In fact, numerous criticisms have been lodged against the lodestar method since it originated in the federal Third Circuit and went into wider practice in the early 1970's. *Ryan v. City of Chicago*, 274 Ill. App. 3d 913, 923, 654 N.E.2d 483, 490 (1995) ("the lodestar approach has been subjected to increased scrutiny as its deficiencies began to offset or exceed its benefits"). A task force appointed by the Third Circuit to compare the respective merits of the percentage-of-recovery and lodestar methods reported that the lodestar method:

"increases the workload of an already overtaxed judicial system, *** creates a sense of mathematical precision that is unwarranted in terms of the realities of the practice of law, *** has led to abuses such as lawyers billing excessive hours, *** creates a disincentive for the early settlement of cases, *** does not provide the trial court with enough flexibility to reward or deter lawyers so that desirable objectives will be fostered, *** [and] is

confusing and unpredictable in its administration." *Ryan*, 274 Ill. App. 3d at 923, 654 N.E.2d at 490 (citing *Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237, 246-49 (1985) (*Third Circuit Report*)).

See also *Brundidge*, 168 Ill. 2d at 242-43, 659 N.E.2d at 913 (quoting Macey & Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U.Chi.L.Rev. 1, 54 (1991) (in which the supreme court criticized the lodestar method in part because "[e]valuating the hours actually expended is a laborious, burdensome, and time-consuming task that may be biased by hindsight," and " '[t]he risk multiplier is little short of a wild card in the already uncertain game of assessing fees under the lodestar calculation' "). The task force recommended retaining the lodestar for some statutory fee cases but concluded that the percentage-of-recovery was the best way to calculate reasonable attorney fees in class action cases. *Ryan*, 274 Ill. App. 3d at 923, 654 N.E.2d at 490-91 (citing *Third Circuit Report*, 108 F.R.D. at 255-56). Peart's argument that a method that is disfavored in class actions should have been used at least for a cross-check of the fee award is an argument for inefficiency. He is proposing what the supreme court disapproved of in *Brundidge*: "protracted satellite litigation involving the attorney fees award" as the trial court determines "the reasonable fees to be awarded based upon hourly rates and the reasonable number of hours expended." *Brundidge*, 168 Ill. 2d at 243, 659 N.E.2d at 913 (acknowledging "valid criticisms" against the lodestar method). Nevertheless, it would have been in the trial judge's discretion to conduct a cross-check. *Brundidge*, 168 Ill. 2d at 244, 659 N.E.2d at 914 ("The decision to award fees based on the lodestar or percentage method is a matter within the sound discretion of the trial court, considering the particular facts and circumstances of each case."). Peart has not persuasively

argued that it was error to proceed solely under the percentage method that is favored in class actions. Furthermore, in addition to being efficient and fair, the percentage approach is likely what the class members and counsel would have negotiated when counsel agreed to take on the case. *In re Capital One Telephone Consumer Protection Act Litigation*, 80 F. Supp. 3d 781, 793 (N.D. Ill. 2015) (indicating that the "normal practice" in consumer class actions is to negotiate compensation based upon a percentage of the recovery). "This is so because fee arrangements based on the lodestar method require plaintiffs to monitor counsel and ensure that counsel are working efficiently on an hourly basis, something a [large class of] lightly-injured plaintiffs likely would not be interested in doing." *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 501 (N.D. Ill. 2015). "The class would not have negotiated a compensation scheme that required a level of monitoring the class members were not interested in or capable of providing." *Capital One*, 80 F. Supp. 3d at 795. Instead, the class would have chosen the compensation scheme that required the least monitoring to align the incentives of the class and its counsel–the percentage method." *Capital One*, 80 F. Supp. 3d at 795. We do not find that the trial court used an improper standard or procedure in determining attorney fees.

¶ 27    Also, the record belies Peart's statement that the award was based solely on trial court being "very familiar with what appropriate fees are." The record shows that the court undertook an in-depth analysis of the facts and had ample evidentiary and legal basis for the 35% award. Consistent with the thorough presentation of facts and law that McCormick's attorney made in seeking the trial court's preliminary and final approvals of the settlement agreement, McCormick's attorney gave the trial court a comprehensive, 29-page memo in support of the motion for attorney fees, expenses, and incentive awards for the class representatives. The memo set out the procedural

history of the case, discussed relevant authority, and explained why counsel considered $15,732,500 (35% of the settlement) to be fair compensation for the work and risks that were undertaken and the result that was achieved. The memo also provided the settlement agreement and release, and sample settlement notices and claim forms which the attorneys had distributed to class members. Also attached to the memo were declarations from plaintiffs' co-counsel Benjamin H. Richman (eight pages) and Robert L. Teel (three pages) regarding their efforts on the case between 2016 and 2020 (see 735 ILCS 5/1-109 (West 2018) (providing for a verified document under penalty of perjury)).

¶ 28     The memo summarized that the settlement was based on allegations that DeVry's 90% placement claim and higher income claim enabled it to charge a tuition premium (not on allegations that a DeVry degree was valueless, but that a DeVry degree was more expensive than it would have been). Counsel recounted that it was disputed as to whether DeVry's statements were inaccurate and how much of a tuition premium it had charged; that similar suits against law schools had been dismissed; and that there had been a significant risk that the litigation would not succeed. Counsel's familiarity with the litigation included two years in motion practice and discovery in federal court before filing in state court, as well as participation in some of the other class actions that were filed in other parts of the country. The state court pleading benefitted from the success and failures of plaintiffs in other jurisdictions. In state court, there was motion practice, settlement negotiations, an unfruitful mediation with Hon. Layn R. Phillips (Ret.), rulings favorable to DeVry which had rekindled its inclination to litigate rather than use alternative dispute resolution, and then rulings that favored McCormick and restarted the negotiations. After written submissions and telephone conferences with Judge Phillips, there was another all-day mediation

session. The attorneys reached an agreement in principle that day, negotiated further, and then agreed to the written terms of settlement and notice that received the court's preliminary approval. Counsels' subsequent work included responding to inquiries and opposing objections.

¶ 29    The supporting memo included Illinois state and federal court cases in which attorney fees were awarded in the 30-to-39% or higher range. See *Ryan*, 274 Ill. App. 3d at 922, 654 N.E.2d at 489 (under Illinois law, "an attorney is entitled to an award from the [common] fund for the reasonable value of his or her services."); *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 572 (7th Cir.1992) ("The object in awarding a reasonable attorney's fee *** is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible."); *Taubenfeld v. AON Corp.*, 415 F.3d 597, 600 (7th Cir. 2005) (approving of the trial court's reliance on "a table of thirteen cases in the Northern District of Illinois where counsel was awarded fees amounting to 30-to-39% of the settlement fund"); see also Herbert Newberg & Alba Conte, *Newberg on Class Actions*, §15.83 (William B. Rubenstein ed., 5th ed.) (50% of a common fund is the upper limit of a reasonable fee award).

¶ 30    During the hearing, the trial judge stated that he was familiar with appropriate awards because he had practiced law for 30 years before becoming a judge and subsequently presided over many class actions. Also, as "the Judge on this case since its inception in Cook County," he had observed McCormick's attorneys to be "highly experienced and more than competent." The judge reviewed precedent and the identified theories of liability and this information confirmed for the court that there had been "significant risk in this case." Nonetheless, McCormick's capable counsel had overcome DeVry's "thin liability" and performed "an extraordinary job" *** to secure the amount of money for the class." The judge also found that the settlement was "truly an

extraordinary resolution to the great benefit of the class" and deemed the 35% fee request to be fair and reasonable compensation.

¶ 31    This record is contrary to Peart's contention that the trial judge's only reason for awarding 35% was being " 'very familiar with what appropriate fees are.' "

¶ 32    The fact that Peart is able to cite three cases suggesting 25% as a benchmark in common fund cases is of no moment. See *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272-73 (9th Cir. 1989) ("We leave to the district court the task of determining what this reasonable percentage should be. Nevertheless, the district court should take note that 25 percent has been a proper benchmark figure, which it can then adjust upward or downward to fit the individual circumstances of this case"); *In re Home Depot Inc.*, 931 F.3d 1065, 1076 (11th Cir. 2019) ("In this Circuit, courts typically award between 20-30%, known as the benchmark range."); *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 51 (2d Cir. 2000) (quoting, 1 Alba Conte, *Attorney Fee Awards* § 2.02 (2d ed.1993) (25% is a " 'formula born from judicial practice and experience,' " however, the court is "disturbed by the essential notion of a benchmark" and cautions that a benchmark is not a "substitute for the searching assessment that should properly be performed in each [common fund] case."). In our opinion, even if the trial judge had used 25% as a starting point, he gave reasons for increasing that percentage, including that he was in the best position to assess the circumstances as he was "the Judge on this case since its inception in Cook County," and that the attorneys were skilled litigators who undertook significant risk in overcoming DeVry's thin liability and achieving an extraordinary settlement for the class. On this record, we do not find that the 35% award was an abuse of discretion.

¶ 33    Affirmed.